**David Richard CARRILLO, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 97SC517.**

Supreme Court of Colorado, En Banc.

Feb. 22, 1999.

Rehearing Denied March 15, 1999.

**480**

Richard E. Mishkin, P.C., Richard E. Mishkin, Lisa A. Vanderhoof, Lakewood, Colorado, Attorneys for Petitioner.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, Paul Koehler, Assistant Attorney General, Criminal Enforcement Section, Denver, Colorado, Attorneys for Respondent.

Justice BENDER delivered the Opinion of the Court.

This murder case involves two distinct issues concerning whether the defendant's right to a fair jury trial was violated. We review the decision of the court of appeals in *People v. Carrillo*, 946 P.2d 544 (Colo.App. 1997), which affirmed Carrillo's convictions. Concerning the first issue, the court of appeals held that the trial court did not abuse its discretion by denying Carrillo's challenge for cause to a prospective juror who knew the victim's father and was a prosecution witness. *See id.* at 548. The second issue arose when the jury announced a verdict that appeared to be non-unanimous when the individual jurors were polled. *See id.* at 550. Upon learning that the lone dissenting juror's hearing problem had prevented him from hearing significant portions of the trial testimony and jury deliberations, the trial court substituted an alternate juror for the dissenting juror. *See id.* The court of appeals held that this mid-deliberation juror substitution did not violate Carrillo's right to a fair trial in light of the precautions taken by the trial court. *See id.* We affirm the judgment of the court of appeals with respect to both issues but on slightly different grounds.

## I. Facts

David Carrillo was one of eight defendants charged in connection with the gang-related murder of Chris Romo. According to evidence presented at trial, in the early morning hours of June 28, 1993, Carrillo's brother, Anthony Carrillo, shot Chris Romo through Romo's bedroom window while Romo was lying on his bed. Chris Romo's father, George Romo, heard the shot and went to his son's bedroom, where his son said that he had been shot by Anthony Carrillo. Later that day Chris Romo died from the gunshot wound.

Of the eight co-defendants, only Carrillo and Phillip Montoya proceeded to trial. Car-

rillo and Montoya were charged with first degree murder and conspiracy to commit first degree murder and were tried jointly. Carrillo faced the additional charge of contributing to the delinquency of a minor—Montoya and another juvenile.

As part of the jury selection process, prospective jurors answered questionnaires concerning their backgrounds and knowledge of the case. One prospective juror, Gilbert Pacheco, stated on the questionnaire that he worked with George Romo, the victim's father, who presumably was listed on the questionnaire as a potential witness. Early in the voir dire process, Pacheco said that he understood the presumption of innocence. In a dialogue with Montoya's attorney, Pacheco initially said that he expected to hear Montoya's side of the story. Upon further questioning, however, Pacheco agreed that if Montoya chose not to present a defense or chose not to testify, he would not hold it against him since he understood that Montoya was not required to do either.

The trial court arranged for the attorneys to question Pacheco in camera concerning his relationship with George Romo. Pacheco stated that he had worked with Romo for five years. Although he and Romo worked in different areas, Romo issued equipment to him. Apparently referring to this time period, Pacheco stated, "I would go in and talk with him and spend a couple of hours, and so – and he would do lots of talking and talking about his family." Pacheco further stated that he and Romo had worked more closely together during the summer before the trial.

Pacheco also said that Romo never mentioned his son's murder to him, but that Pacheco and some of his fellow workers discussed the murder and speculated about what had happened. When asked whether what he had heard about the case influenced him, Pacheco stated:

Well, I think of George because I have a 25–year–old son and a 22–year–old daughter. And if something would happen to them, even though they didn't live with me, I think I would take it kind of hard and want something done about it, you know.

Montoya's attorney responded by telling Pacheco that such feelings were natural but that they had no place in this trial because Pacheco was required to approach his responsibility as "a clean slate." Montoya's attorney then asked Pacheco if he was "a clean slate":

Pacheco: I think – I think I could do a clean slate. I have to think real hard about it to tell you the truth.

Attorney: Okay. But now is the time that you have got to tell us. I mean, you can't think about it later, you know, right? You either can or you can't. You know how important this is to Mr. Montoya. So would you want you to be a juror in this case if you are Mike Montoya?

Pacheco: No, I wouldn't.

Attorney: And I take it that's because you have already formed some opinions?

Pacheco: A little bit, and I've been trying real hard to push it out of the way.

Attorney: And – but you can't. Just – you can't?

Pacheco: No.

At this point, the prosecutor began to question Pacheco. The prosecutor asked Pacheco what he thought had happened in the case. Pacheco replied:

Well, it's everything. We talked at work, and what we read in the paper. George, I never really talked to him about it because he stood away from us, and he was taking it really hard, and we didn't really push him on it. But what happened is, two kids went up and shot Chris in the back. And then they – later on, they caught them. And, you know, right away, I said, "Hey, they are guilty," you know. They caught them, and, you know. And like I said, if you did it, then you should pay for it. That's the way I was always brought up. And if you are wrong, you should pay for it.

The prosecutor followed up by asking Pacheco if he knew the names of the people involved. Pacheco answered that the names started coming up later that summer. These questions and answers followed:

Prosecutor: I mean, you don't know right now?

Pacheco: I don't know them directly.

Prosecutor: I mean, do you think that these people were directly involved in it today?

Pacheco: I just knew by names. I don't know them. It is just the names that I heard.

Prosecutor: Well, what I am getting at is, you listen to the evidence and determine in your own mind whether these two defendants were the ones that were involved?

Pacheco: I would listen to it, yes, and try to base my opinion on what I hear. But as I stated to the defendants here, that I wouldn't like to have me on the jury.

Prosecutor: And that is fine.

Pacheco: Yes. I would listen and try to base my opinion on what I hear.

Prosecutor: You would try to do that?

Pacheco: Yes, sir.

Prosecutor: And would you do that?

Pacheco: Yes, sir.

Prosecutor: Do you think that you could do that?

Pacheco: I think I could.

Prosecutor: Okay. I mean, at this point you don't know whether these defendants were the ones that were involved or not, do you?

Pacheco: No, I don't.

Prosecutor: Are you willing to listen to the evidence and decide it based on what's presented to you?

Pacheco: Yes, I think I would.

Additional questioning by Carrillo's attorney revealed that Pacheco had never met Chris Romo but knew about him from talking to George Romo. The court did not ask Pacheco any questions.

Carrillo challenged potential juror Pacheco for cause, and the court summarily denied the challenge. Carrillo later used one of his peremptory challenges to remove Pacheco from the jury. Carrillo subsequently exercised all of his peremptory challenges.

Also during jury selection, a prospective juror, Adolph Cordova, repeatedly said that he had difficulty hearing but that his doctor told him that he did not need a hearing aid. The prosecutor offered to stipulate to a challenge for cause in light of Cordova's hearing problem. However, the trial court stated that Cordova seemed able to hear and no such stipulation was reached. Both defendants passed Cordova for cause. Eventually, the court impaneled a jury of twelve, including Cordova, plus four alternate jurors.

Carrillo's theory of defense was that when he and the others went to Romo's house, their only agreement and intention was to break Romo's windows. Carrillo argued that his brother, Anthony Carrillo, committed the murder without his knowledge or participation.

At the close of trial, after instructing the jury, the court informed the four alternate jurors that although they were free to leave the courtroom, they were not discharged from jury service. The court told the alternates that its previous instructions concerning their conduct as jurors were still applicable. The court also specifically instructed the alternates not to have contact with any member of the press.

The jury retired to deliberate at a few minutes past 3:00 p.m. They continued deliberating, with one brief interruption, until recessing shortly after 5:00 p.m. The jurors resumed deliberation the next morning at 8:30 a.m. At 11:15 a.m., they announced that they had reached a verdict. The verdict forms indicated that the jury found both Carrillo and Montoya guilty of first degree murder and conspiracy to commit first degree murder. The verdict forms further indicated that the jury found Carrillo guilty of contributing to the delinquency of a minor. In addition, the verdict forms indicated that the jury found both Carrillo and Montoya not guilty of conspiracy to commit criminal mischief under $400, a lesser-included offense.

The court announced these verdicts and the jury foreperson stated that he agreed with the verdicts. However, when the court polled the jurors individually, juror Cordova twice replied that he found Carrillo not guilty of the count of contributing to the delinquency of a minor. The court did not accept any of the verdicts and did not officially enter them as the judgments of the court. Remarking that the verdict on the charge of

contributing to the delinquency of a minor was not unanimous, the court sent the jury back to retire and reconsider all of the verdicts.

Within an hour, the jury sent out the following note, signed by the foreperson:

> The jury has come to believe the juror Adolph Cordova did not hear all of the testimony, does not fully understand all of the charges and instructions, and did not hear some discussion in deliberations. We the jury do not believe we can render a verdict under these circumstances.

Upon receipt of this note, the court proposed to remove juror Cordova from the jury, replace him with an alternate juror, and instruct the jury to "recommence" their deliberations. Montoya and Carrillo objected and made a motion for a mistrial, which was denied.

The court brought the jury back and informed them of its order that juror Cordova be removed and replaced with the first alternate juror. The court told the jury that they were to "recommence" their deliberations. The court also told the jury that they would be given new jury verdict forms so that they could start out fresh. The court reminded the jury that they were under instructions not to talk about the case, not to contact any of the parties or witnesses, not to read or listen to any news about the case, and not to visit any scenes involved in the case. The court then excused juror Cordova and recessed for lunch.

Over the lunch break, the court conducted an in camera proceeding with all the parties and juror Cordova. The court set aside its earlier order dismissing juror Cordova and stated that the purpose of the in camera hearing was to give juror Cordova an opportunity to respond to the jury's note about him. Juror Cordova stated that because of his hearing problem he had missed quite a bit of the trial testimony and had been lip-reading during jury deliberations. The court found that juror Cordova's inability to hear undermined his ability to make an informed decision based on the law. Therefore, the court excused juror Cordova and again proposed to replace him with the first alternate juror. Once again, both Montoya and Carrillo objected and moved for a mistrial. The court denied these motions.

The court conducted an inquiry of the first alternate juror. She confirmed that she remembered the court's instructions about juror conduct and had followed them. She stated that since the jury retired to deliberate, she had not had any contact with anyone associated with the case and had not talked about the case with anyone. She also stated that she had not conducted any of her own investigations, had not made reference to any other materials regarding the case, and had not heard or read any news reports about the case.

Next, the court conducted an inquiry of the eleven remaining jurors. The court instructed the jurors that juror Cordova had been discharged and that there was an alternate available. The court then asked each of the jurors individually whether they could put their previous deliberations out of their minds and begin their discussions anew. Each juror said yes. The court asked whether any juror had difficulty with starting anew and whether any juror would like to discuss the issue further outside the presence of the other jurors. Receiving no response from any of the eleven jurors, the court placed the first alternate on the jury as a substitute for juror Cordova.

The court then told the reconstituted jury ("the second jury") that they would receive the instructions and new verdict forms. The court instructed the second jury to begin their deliberations anew, uninfluenced by any earlier discussions engaged in by the first jury. The second jury began deliberations at 2:30 p.m. At 4:00 p.m., the jury sent out their notes from the previous deliberations, which were torn into pieces. The court noted that the jury's purpose in doing this was to prevent the notes made during the initial deliberation from influencing them at this time. Later that afternoon, the jury sent out a written question concerning the applicability of the culpable mental state definitions to various other jury instructions. At 4:50 p.m., the court addressed the jury's question and granted the jury's request to recess for the night.

The next day, after further deliberation, the second jury advised the court that it had reached a verdict. Before bringing the jury into the courtroom, the court noted that the first jury had deliberated for four hours and twenty minutes, while the second jury had deliberated for six hours and twenty minutes. The second jury found Carrillo and Montoya guilty of first degree murder and conspiracy to commit first degree murder. The second jury also found Carrillo guilty of contributing to the delinquency of a minor. The court received the verdicts and entered them as judgments of the court.

## II. Proceedings Below

Carrillo asserted several errors on appeal to the Colorado Court of Appeals, which affirmed his convictions. *See Carrillo,* 946 P.2d at 547. Relevant to the proceeding before us, Carrillo asserted that the trial court's denial of his challenge for cause to prospective juror Pacheco constituted an abuse of discretion. Carrillo also argued that the trial court committed reversible error by substituting an alternate juror after verdicts had been rendered.

The three-judge panel of the court of appeals issued three separate opinions regarding the denial of the challenge for cause of prospective juror Pacheco. The majority opinion noted that Pacheco's responses did not reveal an unyielding belief that Carrillo was guilty or an unwillingness to make a decision based upon the law and the evidence presented at trial. The majority held that "regardless of whether we might have reached a contrary result, we perceive no clear abuse of discretion by the trial court in refusing to dismiss [this juror] for cause." *Carrillo,* 946 P.2d at 548.

In a special concurrence, Judge Rothenberg wrote, "Although I conclude that there was no gross abuse of discretion in the trial court's denial of [Carrillo's] challenge for cause, I view this one ruling as being precipitously close to requiring reversal." *Id.* at 552 (Rothenberg, J., specially concurring). Judge Rothenberg referred to Pacheco as a "highly questionable potential juror" and stated that in light of the rule requiring automatic reversal for the erroneous denial

of a defendant's challenge for cause, it is "extremely unwise for a trial court to jeopardize an otherwise valid conviction ... by retaining a juror whose impartiality is questioned." *Id.* at 553 (Rothenberg, J., specially concurring).

Writing in dissent, Judge Jones argued that prospective juror Pacheco had admitted preconceived notions and biases that made it appear doubtful that he could be fair and had been, "at best, ambivalent as to whether he could follow the court's instructions." *Id.* at 554 (Jones, J., dissenting). Viewing these facts in conjunction with Pacheco's "personal acquaintance with the victim's father and continued employment with the same employer," Judge Jones concluded that the trial court's denial of this challenge for cause was an abuse of discretion. *See id.* (Jones, J., dissenting).

With respect to the issue of the substitution of the first alternate for juror Cordova, the court of appeals found that the trial court had the authority under both Crim. P. 24(e) and section 16–10–105 to replace a juror with an alternate after the jury had started deliberations. *See id.* at 549–50. In *People v. Burnette,* 775 P.2d 583, 587–88 (Colo.1989), this court held that Crim. P. 24(e) did not give trial courts the discretion to engage in mid-deliberation substitution of jurors and that such substitution raises a presumption of prejudice to the defendant which may be rebutted if the trial court takes adequate precautions. Although the court of appeals held that the trial court *did* have the authority to engage in mid-deliberation substitution of jurors, it declined to rule on whether this meant that fewer precautions than the ones set forth in *Burnette* were required, finding that the trial court's conduct here was sufficient to comply with the requirements of that case. *See Carrillo,* 946 P.2d at 550. Thus, the court of appeals held that the trial court's substitution procedures were adequate to rebut the presumption of prejudice to Carrillo's right to a fair trial. *See id.*

We granted certiorari to decide (1) whether the trial court's denial of Carrillo's challenge for cause to Pacheco violated Carrillo's right to a fair trial and (2) whether the substitution of an alternate juror mid-delib-

eration violated Carrillo's right to a fair trial.[1]

## III.   Denial of the Challenge for Cause

We affirm the court of appeals with respect to the trial court's denial of Carrillo's challenge for cause to prospective juror Pacheco. We hold that although Pacheco expressed some knowledge about the case, it was within the trial court's discretion to accept his statement that he would base his decision on the evidence presented at trial. We further hold that Pacheco's statements about his relationship with the victim's father did not reveal the existence of a state of mind evincing enmity or bias towards Carrillo.

### A.   Standard of Review

■ As a preliminary matter, we address the standard for appellate review of a trial court's ruling on a challenge for cause to a prospective juror. We hold that the standard for such review is whether the trial court abused its discretion.

A survey of Colorado case law reveals that the abuse of discretion standard has been stated several different ways in the context of reviewing a trial court's ruling on a challenge for cause. Some cases contain language describing the standard as a *gross* abuse of discretion.[2] Other cases state the standard as a *clear* abuse of discretion.[3] At least one case articulates the standard simply as an abuse of discretion.[4] In this case, the People urge us to hold that a *heightened* or *serious* abuse of discretion standard be applied on appellate review of a trial court's ruling on a challenge for cause.

The three opinions in the court of appeals decision in Carrillo's case illustrate how the use of such modifiers results in confusion, as each of the three judges appears to apply a different standard of review. The majority opinion summarizes its analysis of the denial of the challenge for cause by stating, "we perceive no *clear* abuse of discretion." *Carrillo*, 946 P.2d at 548 (emphasis added). The special concurrence concludes that there was "no *gross* abuse of discretion." *Id.* at 552 (Rothenberg, J., specially concurring)(emphasis added). The dissent expresses the opinion that "the trial court's failure to dismiss this juror for cause constitutes an abuse of discretion." *Id.* at 554 (Jones, J., dissenting).

■ The use of these modifiers creates the appearance of inconsistency and unfairness. This is particularly true here, where the specially concurring judge voted to affirm the convictions because she found no *gross* abuse of discretion, yet she also found that the trial court's ruling was "precipitously close to requiring reversal." *Id.* at 552. This raises the unfortunate implication that this judge might have reached a different result by applying an unmodified abuse of discretion standard. Therefore, we hold that the phrases "abuse of discretion," "clear abuse of discretion," and "gross abuse of discretion" contained in our prior case law all have the same meaning.

■ In declining the People's invitation to adopt a heightened abuse of discretion standard in this context, we emphasize that the abuse of discretion standard is already a very

1. The precise wording of the issues that we granted certiorari on is:
   (1) Whether David Richard Carillo (Carrillo) was denied his substantive constitutional right to a fair trial when the district court denied a challenge for cause with respect to potential juror Pacheco and Carrillo was forced to use a peremptory challenge as to Mr. Pacheco.
   (2) Whether Carrillo's substantive constitutional right to a fair trial was denied by the substitution of an alternate juror following deliberations.

2. *See People v. Abbott*, 690 P.2d 1263, 1266–67 (Colo.1984); *People v. Arevalo*, 725 P.2d 41, 47 (Colo.App.1986).

3. *See People v. Fuller*, 791 P.2d 702, 706–07 (Colo.1990); *People v. Drake*, 748 P.2d 1237, 1244 (Colo.1988); *People v. Sandoval*, 733 P.2d 319, 321 (Colo.1987); *People v. Russo*, 713 P.2d 356, 362 (Colo.1986); *People v. Vigil*, 718 P.2d 496, 500 (Colo.1986); *People v. West*, 724 P.2d 623, 630 (Colo.1986); *People v. Veloz*, 946 P.2d 525, 530, 532 (Colo.App.1997), *cert. denied*, No. 97SC365 (Colo. Nov. 3, 1997); *People v. Moya*, 899 P.2d 212, 216 (Colo.App.1994); *People v. Ferrero*, 874 P.2d 468, 470 (Colo.App.1993).

4. *See People v. Rhodus*, 870 P.2d 470, 477 (Colo. 1994).

high standard of review. This standard gives deference to the trial court's assessment of the credibility of a prospective juror's responses. It recognizes the trial court's unique role and perspective in evaluating the demeanor and body language of live witnesses, and it serves to discourage an appellate court from second-guessing those judgments based on a cold record.

## B. Analysis

Carrillo argues that the trial court's refusal to dismiss prospective juror Pacheco for cause denied him his constitutional right to a fair trial by forcing him to exercise a peremptory challenge on Pacheco. The core of Carrillo's argument is that Pacheco's personal relationship with the victim's father created an actual bias against Carrillo. Carrillo argues that Pacheco himself questioned his ability to be fair and impartial under the circumstances. Carrillo further argues that it is self-evident that most jurors would be reluctant to serve on a jury involving the murder of a co-worker's family member and would be uncomfortable at the prospect of having to face co-workers after the verdict, especially in the event of an acquittal.

In response, the People counter that the record does not show that Pacheco was biased against Carrillo. The People argue that Pacheco's comment that if he were the defendant, he would not want himself on the jury, rather than evincing bias, demonstrates conscientiousness. Finally, the People argue that the trial court did not abuse its discretion in crediting Pacheco's statements that he could set aside his preconceived notions about the case and decide his verdict based on the evidence presented at trial.

■ We begin our analysis with the fundamental principle that "the right to challenge a juror for cause [is] an integral part of a fair trial." *People v. Macrander,* 828 P.2d 234, 238 (Colo.1992). The General Assembly has set forth by statute the grounds on which a trial court is required to grant a challenge for cause to a potential juror. *See* § 16–10–103. Section 16–10–103 lists many categories of potential jurors who must be dismissed due to implied bias, which is bias that is

conclusively presumed as a matter of law. *See* § 16–10–103(1)(b)–(i), (k).

■ At issue in this case, however, is a challenge for cause for actual bias under paragraph (1)(j) of section 16–10–103, which involves the trial court's determination of whether a prospective juror has a state of mind that is biased toward either party:

**16–10–103. Challenge of jurors for cause.** (1) The court shall sustain a challenge for cause based on one of more of the following grounds:

. . .

(j) The existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state; however, no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

6 C.R.S. (1998). As we have explained, "[a]ctual bias is a state of mind that prevents a juror from deciding the case impartially and without prejudice to a substantial right of one of the parties." *Macrander,* 828 P.2d at 238. In instances where actual bias is alleged, the trial court is in a unique position to assess a prospective juror's credibility:

We have accorded a trial court considerable discretion in ruling on causal challenges predicated on actual bias primarily because such challenges require an assessment of the prospective juror's credibility, demeanor, and sincerity in explaining his or her state of mind and because the trial court is in a preferred position to evaluate those factors.

*Id.* To determine whether the trial court abused its discretion in ruling on a challenge for cause, the entire voir dire of the prospective juror must be reviewed by the appellate court. *See People v. Abbott,* 690 P.2d 1263, 1267 (Colo.1984).

■ When a trial court erroneously denies a challenge for cause to a prospective juror, the defendant uses a peremptory challenge

to remove that juror, and the defendant exhausts all available peremptory challenges, the trial court's ruling "affects a substantial right of the defendant and cannot be deemed harmless error." *See Macrander,* 828 P.2d at 244.

■ Having reviewed the entire record of the voir dire of prospective juror Pacheco, and regardless of whether we might have reached a different conclusion, we hold that the trial court acted within its discretion in denying Carrillo's challenge for cause. Pacheco's answers to the attorneys' questions reveal three areas that require scrutiny concerning his ability to be fair and impartial in this case: (1) his preconceived opinions about the case based on his prior knowledge of some of the facts; (2) his statements that if he were one of the defendants, he would not want himself on the jury; and (3) his comments about his relationship with George Romo, the father of the victim and a prosecution witness in the case. We briefly address each in turn.

■ Although Pacheco stated that he had not discussed the murder with the victim's father, he had read about the case in the newspaper and had speculated with his co-workers about what had happened. When pressed to explain what he actually knew about the case, he said that "two kids" had shot Chris Romo in the back and that when the police apprehended them afterward, Pacheco assumed they were guilty. However, Pacheco agreed that he could listen to the evidence and decide the case based on the evidence. "[T]he trial judge is the only judicial officer able to assess fully the attitudes and state of mind of a potential juror by personal observation of the significance of what linguistically may appear to be inconsistent or self-contradictory responses to difficult questions." *People v. Sandoval,* 733 P.2d 319, 321 (Colo.1987). Thus, concerning Pacheco's knowledge of some of the facts, we find no abuse of discretion by the trial court in its determination that Pacheco would "render an impartial verdict according to the law and the evidence submitted to the jury at the trial." § 16–10–103(1)(j).

■ We now turn to the second area of scrutiny. Pacheco twice stated that if he were one of the defendants, he would not want himself serving on the jury. We note that this bare assertion does not constitute a state of mind evincing bias against the accused. There are many different reasons why a potential juror might say that he or she would not be a good juror, and not all of these reasons reflect a bias against the defendant. For example, many prospective jurors would rather not serve on a jury during a period of time in their life when they are preoccupied with pressing problems at work or at home. It is logical for such prospective jurors to reason that if they were the accused, then they would rather have a juror who was able to pay closer attention to the trial. Using analogous reasoning, our court of appeals has noted that in a homicide case, a prospective juror who expressed emotional distress due to the difficulty of dealing with the concept of death displayed no enmity or bias against the defendant. *See People v. Fink,* 41 Colo.App. 47, 50, 579 P.2d 659, 661 (1978). To the extent that Pacheco's statements about the defendants not wanting him to be on the jury refer in context to his prior knowledge of the facts of this case, we reiterate that it was within the trial court's discretion to find that the prosecutor adequately rehabilitated Pacheco on this issue. Thus, on the record before us, we find that the court did not abuse its discretion in denying the challenge for cause based on these statements.

■ The third area we address is the nature of Pacheco's relationship to George Romo, the father of the victim and a prosecution witness in the case. Pacheco worked with Romo, and Romo had talked with him about his family. Pacheco was aware that Romo was taking the murder of his son "really hard." Pacheco stated:

> Well, I think of George because I have a 25–year old son and a 22–year old daughter. And if something would happen to them, even though they didn't live with me, I think I would take it kind of hard and want something done about it, you know.

Neither the attorneys nor the court asked Pacheco whether he would assess Romo's

credibility any differently than any other witness.

We recognize that the American Bar Association has expressed a policy preference for the dismissal of potential jurors who have a personal or social relationship with a witness because such jurors "may be biased, or give the appearance of bias." *ABA Criminal Justice Trial By Jury Standards* § 15–2.5 commentary at 161 (3d ed.1996). However, we also note that the General Assembly did not believe that these relationships created such inherent potential for bias as to require dismissal for implied bias. *See* § 16–10–103. Thus, we decline to hold that the nature of the relationship between Pacheco and Romo, in and of itself, required Pacheco's dismissal.

Pacheco's answers to questions about his working relationship with Romo appear ambiguous and fail to articulate a clear expression of bias requiring his dismissal. Indeed, we contrast the ambiguous nature of Pacheco's responses with those of a potential juror in a different case who plainly stated that she could not be fair:

> I don't think I should sit on the jury. A week ago, I had my car broken into and burglarized. And it was a bad experience and I don't think it would be fair. I have been thinking about it all night and I don't think I could be fair.

*Nailor v. People*, 200 Colo. 30, 31, 612 P.2d 79, 80 (1980) (holding that the trial court's denial of a challenge for cause to the potential juror constituted an abuse of discretion).

■ Here, although it would have been better practice for the trial judge to question Pacheco in order to fully explore his feelings, we do not find that the record of Pacheco's answers taken as a whole demonstrates that he had a state of mind evincing bias against Carrillo. Hence, we hold that the trial court acted within its discretion when it denied Carrillo's motion challenging this prospective juror for cause.

### IV. Substitution of the Alternate Juror

■ Next we address the issue of the trial court's mid-deliberation substitution of an alternate juror. We find that whether the legislature has granted trial courts the authority to substitute alternate jurors once deliberations have begun is unclear. We note that such a practice is disfavored and should be resorted to only on rare occasions. We reaffirm the principle articulated a decade ago in *People v. Burnette*, 775 P.2d 583 (Colo.1989), that such substitution raises a rebuttable presumption of prejudice to the defendant's right to a fair trial. Applying the principles discussed in *Burnette*, we hold that the trial court substantially complied with the precautions suggested in that case, and that these precautions, combined with the circumstances of this case, were sufficient to rebut the presumption of prejudice to Carrillo. Thus, we affirm the court of appeals.

### A. Authority to Substitute Alternate Jurors Following the Commencement of Jury Deliberations

■ The authority of a trial court to substitute alternate jurors following the commencement of jury deliberations is necessarily predicated on whether a trial court has the discretion to require that alternate jurors remain available for service even after the jury has retired to deliberate. The timing of the discharge of alternate jurors is addressed both by section 16–10–105 and by Crim. P. 24(e). Because this issue is a matter of substance and not merely a matter of court procedure, we look to the statute, which controls. *See People v. Wiedemer*, 852 P.2d 424, 436 (Colo.1993); *People v. Hollis*, 670 P.2d 441, 442 (Colo.App.1983) (holding that where a supreme court rule conflicts with a statute concerning the number of peremptory challenges allowed to a criminal defendant, the statute controls).

The pertinent statute, section 16–10–105, was amended in 1990 and then again in 1991. The current version of this section, which has not changed since Carrillo's trial in December 1994, contains internal inconsistencies concerning whether the court has discretion over the timing of the discharge and the substitution of alternate jurors:

> **16–10–105. Alternate jurors.** The court may direct that a sufficient number of alternate jurors in addition to the regular jury be called and impaneled to sit as

alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, *prior to the time the jury retires to consider its verdict,* become unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities, and privileges as the regular jurors. *An alternate juror shall be discharged when the jury retires to consider its verdict or at such time as determined by the court.* When alternate jurors are impaneled, each side is entitled to one peremptory challenge in addition to those otherwise allowed by law.

6 C.R.S. (1998) (emphasis added). Thus, the plain language of the second sentence suggests that alternates will only be substituted for regular jurors before jury deliberations begin, while the fourth sentence may be read to vest discretion in the trial court to substitute alternates at a later stage of the proceedings, including once deliberations have started.

Two divisions of the Colorado Court of Appeals reached opposite interpretations about whether section 16–10–105 gives the trial court discretion to substitute an alternate juror once the regular jurors have begun their deliberations. In *People v. Montoya,* 942 P.2d 1287 (Colo.App.1996), *cert. denied,* No. 97SC192, (Colo. Sept. 8, 1997)(the opinion resulting from the appeal by Carrillo's codefendant), a division of the court of appeals interpreted the phrase "or at such time as determined by the court" to mean that " 'such time' for possible discharge is prior to the commencement of deliberations." *Montoya,* 942 P.2d at 1295. The court of appeals reached this conclusion by applying the principle of statutory construction that requires appellate courts to give "consistent, harmonious, and sensible effect to all of the statute's provisions." *Id.* As this panel of the court of appeals reasoned, interpreting this phrase to mean that the trial court possesses the discretion to retain alternate jurors in service after the jury retires to consider its verdict "would render the two sentences at issue meaning-

less." *Id.* The court of appeals further noted that the legislative history of the 1990 and 1991 amendments supports this interpretation of section 16–10–105:

> In 1990, in responding to two mistrials caused by the incapacity of jurors occurring during deliberations, the General Assembly amended the statute to require that a trial court retain alternate jurors until a verdict had been rendered. In 1991, however, the General Assembly decided to return to the pre–1990 requirement that a trial court dismiss alternate jurors at the start of deliberations because many trial courts could not properly sequester alternate jurors apart from the other regular jurors during deliberations.

*Id.* (citations omitted).

In the case we now review, a separate division of the court of appeals reached the opposite conclusion in interpreting section 16–10–105. *See People v. Carrillo,* 946 P.2d 544, 549 (Colo.App.1997). In *Carrillo,* the court found that section 16–10–105 gives trial courts the discretion to delay the discharge of an alternate juror:

> The end result of the [1990 and 1991] statutory amendments is that § 16–10–105 now provides, as it did before the amendments, that an alternate juror is to be discharged when the jury retires to consider its verdict, with one important addition: the trial court in its discretion may dismiss the alternate at a different time.

*Id.* The *Carrillo* court expressly declined to follow the *Montoya* court's construction of section 16–10–105. *See id.* at 550. Both the *Carrillo* court and the *Montoya* court cited the legislative hearings for the 1990 and 1991 amendments as supporting their respective constructions of the statute. *See Carrillo,* 946 P.2d at 549; *Montoya,* 942 P.2d at 1295.

Carrillo now urges us to construe section 16–10–105 consistent with the *Montoya* court, while the People urge us to construe that section consistent with the *Carrillo* opinion below.

We recognize the latent ambiguity in the plain language of the statute. We further recognize that, as two divisions of our court of appeals have demonstrated, the legislative

history of section 16–10–105 can be read to support conclusions that are diametrically opposed. We find it unnecessary to resolve this dispute. The question of whether the trial court possesses the statutory authority to substitute alternate jurors mid-deliberation does not assist our analysis. Regardless of the answer to this question, such mid-deliberation substitution raises a presumption of prejudice to the defendant's right to a fair trial. The *Montoya* court, after ruling that section 16–10–105 did not authorize trial courts to engage in mid-deliberation substitution of jurors, applied our analytical framework in *Burnette* to hold that the presumption of prejudice to the defendant had been overcome.[5] In contrast to the *Montoya* court, the *Carrillo* court found that the trial court was authorized by statute to substitute a juror after the jury has begun to deliberate. *See Carrillo*, 946 P.2d at 549–550. Nonetheless, the *Carrillo* court also applied a *Burnette* analysis. *See Carrillo*, 946 P.2d at 550. In doing so, the *Carrillo* court reached the same conclusion that the *Montoya* court reached upon reviewing the identical trial record: "that the trial court conducted a sufficient inquiry and took adequate precautions to comply with the supreme court's admonitions in *Burnette*." *Id.*

### B. *People v. Burnette*

In *Burnette*, we held that the mid-deliberation replacement of a juror "raises a presumption of prejudice to the defendant's right to a fair trial, [which] may be overcome by an adequate showing that procedural precautions taken by the trial court obviated the danger of prejudice to the defendant." *Burnette*, 775 P.2d at 588. Noting that "[t]he potential for prejudice ... is great," we listed a number of dangers to a defendant's right to fair trial that occur when an alternate juror is substituted after a jury has begun deliberations:

> Where an alternate juror is inserted into a deliberative process in which some jurors may have formed opinions regarding the defendant's guilt or innocence, there is a real danger that the new juror will not have a realistic opportunity to express his views and to persuade others. Moreover, the new juror will not have been part of the dynamics of the prior deliberation, including the interplay of influences among and between jurors, that advanced the other jurors along their paths to a decision. Nor will the new juror have had the benefit of the unavailable juror's views. Finally, a lone juror who cannot in good conscience vote for a conviction might be under great pressure to feign illness in order to place the burden of decision on an alternate.

*Id.* As we noted in *Burnette*, "[f]or reasons such as these, the practice of replacing a juror with an alternate at such a sensitive stage of the proceedings has been disapproved in the ABA Standards for Criminal Justice § 15–2.7 (1986)." *Id.*[6]

In *Burnette*, we ultimately concluded that the substitution of an alternate juror mid-deliberation creates a rebuttable presumption of prejudice to the defendant:

> Because a just verdict cannot be reached if there is an inappropriate interference with or intrusion upon the deliberative process, the mid-deliberation replacement of a regular juror with an alternate must be presumed to have prejudiced the defendant. Such a presumption can be overcome only by a showing that the trial court took extraordinary precautions to ensure that

---

5.  *Burnette* was predicated on the conclusion that Crim. P. 24(e) did not provide the trial court with authority to substitute a juror mid-deliberations. *Burnette*, 775 P.2d at 587.

6.  In the most recent edition, this can be found at *ABA Criminal Justice Trial by Jury Standards* § 15–2.8 (3d ed.1996).

The *Burnette* court also cited Charles Alan Wright's treatise, *Federal Practice and Procedure*, for the proposition that Fed.R.Crim.P. 24(c), the federal counterpart to our Crim. P. 24(e), does not permit the substitution of alternate jurors

once deliberations have begun and that the federal rules committee explicitly rejected a proposal for such substitutions. *See Burnette*, 775 P.2d at 588. Wright also explains that the federal rules now allow the court to accept a verdict from a jury of eleven jurors and that the Advisory Committee on Criminal Rules "concluded that this was preferable to allowing alternates to be substituted after deliberations had begun." Charles Alan Wright, *Federal Practice and Procedure: Criminal 2d* § 388 (2d ed. 1998 Supp.).

the defendant would not be prejudiced and that under the circumstances of the case, the precautions were adequate to achieve that result.

*Id.* at 590. In deciding that the presumption of prejudice in *Burnette* had not been rebutted, we relied on the following factors. First, the alternate juror was substituted after the original jury deliberated for four and a half hours "and may well have made progress toward formulating positions." *Id.* Second, the reconstituted jury deliberated for less time than the original jury. *See id.* Third, "[a]lthough the trial judge instructed the regular jurors to begin deliberations anew, he did not inquire of them whether they would be capable of disregarding their previous deliberations and any opinions they may have formed on the questions presented by the evidence." *Id.* Fourth, the court failed to inquire whether the regular jurors "could be receptive to the alternate juror's attempt to assert a non-conforming view." *Id.* Fifth, the alternate juror "had resumed his normal functions in the community," was not instructed to refrain from forming an opinion based on information that might come to his attention after the trial, and was not questioned about his post-trial activities or his present ability to serve on the jury. *Id.* "In sum, the trial judge received no assurances from either the remaining eleven jurors or the alternate juror that the ability of the reconstituted jury to render a fair verdict would be unimpaired by the substitution." *Id.*

## C. Application of *Burnette* to this Case

We explicitly re-affirm the principles articulated in *Burnette*. We turn now to applying these principles and the factors considered in *Burnette* to the facts here.

▓ First, we note that in instances such as this—where verdicts had been announced and where the juror excused was a lone holdout for acquittal on one count—extraordinary scrutiny is required before an appellate court may be assured that under the circumstances of the case, the precautions taken by the trial court were adequate to protect the defendant's right to a fair trial. Courts should particularly strive to avoid the practice of mid-deliberation substitution of a juror when the deliberation process has already progressed to the stage of announcing verdicts and where the juror who is the source of non-unanimity is the one who is subsequently excused.[7] Such a procedure raises the specter of one of the dangers that we warned about in *Burnette:* that a lone dissenting juror under pressure would be tempted to feign illness in order to be relieved of his or her decision-making responsibility. *See id.* at 588.[8] There also exists the danger that the court's actions in excusing the lone holdout juror may be interpreted as a comment on the merits of the case – in effect, that the juror is being excused because, in the court's opinion, the juror reached the wrong result. We note that there is always a question about whether even the most well-intentioned jurors who agree to put their previous deliberations aside and begin anew will in fact be able to

7. *Compare State v. Miley,* 77 Ohio App.3d 786, 603 N.E.2d 1070, 1076 (1991) (holding that after a partial verdict had been reached, it was plain error for the trial court to substitute an alternate juror for the purpose of continuing deliberations in order to reach a verdict on the final count) *and State v. Corsaro,* 107 N.J. 339, 526 A.2d 1046, 1055 (same) *with State v. Holloway,* 288 N.J.Super. 390, 672 A.2d 734, 742 (finding no reversible error where trial court replaced a juror who was the source of non-unanimity with an alternate) *and People v. Aikens,* 207 Cal. App.3d 209, 254 Cal.Rptr. 30, 32–33 (1988) (finding no reversible error where the trial court substituted an alternate after the jury had reached a verdict on one of two counts).

8. The Ninth Circuit Court of Appeals engaged in similar reasoning when it held that the substitu-

tion of an alternate after the original jury had returned a verdict which was not accepted was reversible error:

> The inherent coercive effect upon an alternate juror who joins a jury that has, as in this case, already agreed that the accused is guilty is substantial. Moreover, such a procedure significantly limits the accused's right to a mistrial if the original jury cannot reach agreement. A lone juror who could not in good conscience vote for conviction could be under great pressure to feign illness or other incapacity so as to place the burden of decision on an alternate juror.

*United States v. Lamb,* 529 F.2d 1153, 1156 (9th Cir.1975).

do so when they have already gone through the process of reaching a verdict.[9] In situations like this, we anticipate that the presumption of prejudice will be rebutted only in unusual circumstances.

■ Turning to the specific of this case, we find that the potential for prejudice that arose when juror Cordova was dismissed following the announcement of verdicts was overcome. Here, we may be confident that the cause of juror Cordova's dismissal – his hearing problem—was not manufactured in response to undue pressure from the other jurors. During voir dire, juror Cordova was forthcoming about his hearing problem, and his difficulty hearing was evident to such an extent that the prosecutor offered to stipulate to cause.[10] When the jury sent out the note in order to bring this issue to the attention of the court, the court's inquiry of juror Cordova revealed no evidence of undue pressure. Rather, juror Cordova's forthright responses to the court's questions revealed that he missed significant portions of the trial testimony and was unable to hear the other jurors during deliberations.

The court's precautions regarding the alternate juror were adequate under *Burnette*. At the end of the trial, the court informed the alternate jurors that they were not discharged and that they were still required to follow the court's previous instructions regarding juror conduct. Later, before placing the first alternate onto the jury, the court conducted a detailed inquiry of her during which she stated that she had followed all of the court's instructions.

With respect to the eleven original jurors, the court instructed them to put their previous deliberations out of their minds and begin again. The court then received the assurance of each individual juror that he or she could follow this instruction.

We recognize that the court's instructions to the eleven remaining jurors fell short of the precise instructions suggested in *Burnette* because the court neglected to inquire "whether they could be receptive to the alternate juror's attempt to assert a non-conforming view." *Burnette*, 775 P.2d at 591. However, we are persuaded that the second jury did in fact begin deliberations anew and that the single lapse in the precautionary instruction in this case does not undermine the overall rebuttal of the presumption of prejudice to Carrillo. As the trial court noted, the second jury deliberated for two hours longer than the first jury. On its own accord, the second jury sent out the torn notes from the first jury's deliberations so that they would not be influenced by them. Moreover, the

9. We note that in disapproving of the entire practice of mid-deliberation substitution of jurors, the ABA expressed skepticism about this possibility:

> Although it has been suggested that the jury would be instructed, after such a substitution, to begin its deliberations as if no prior deliberations had taken place, it is uncertain that, even when so instructed by the court, the jury could truly go back to "square one," discussing the case anew as though no prior deliberations had occurred, and repeating all prior arguments for the sake of the newcomer.

*ABA Criminal Justice Trial by Jury Standards* § 15–2.9 commentary at 176 (3d ed.1996).

10. Although somewhat tangential to the issues presented by this appeal, we recognize that the State of Colorado does not allow the automatic exclusion of prospective jurors with hearing problems, consistent with the Americans with Disabilities Act of 1990(ADA):

> **13–71–104. Eligibility for juror service – prohibition of discrimination.** . . .
> (3)(b) A person with a disability shall serve, except where the court finds that such person's disability prevents the person from performing the duties and responsibilities of a juror. Before dismissing a person with a disability on the basis of that person's disability, the court shall interview the person to determine the reasonable accommodations, if any, consistent with federal and state law, that the court shall make available to permit the person to perform the duties of a juror.

5 C.R.S (1998). Similarly, in recognition of "a growing awareness of the rights of disabled persons, and the necessity to provide for all citizens the opportunity to participate in civic affairs, including service on juries," the ABA has suggested that "[a] deaf juror may be accommodated if provided with a sign language interpreter." *ABA Criminal Justice Trial by Jury Standards* § 15–2.1 commentary at 145, 147 (3d ed.1996). More than a decade ago, and prior to the passage of the ADA, the Tenth Circuit Court of Appeals held that deafness did not disqualify a potential juror and that the presence of a sign language interpreter in jury deliberations did not deprive the defendant of a fair and impartial trial by jury. *See United States v. Dempsey*, 830 F.2d 1084, 1088, 1091 (10th Cir.1987).

second jury sent out a question to the trial court concerning the jury instructions, demonstrating that they were indeed analyzing the evidence and the law anew. These factors convince us that the second jury followed the trial court's instructions to begin deliberations anew.

As our decision in *Burnette* made clear, in the event of a mid-deliberation juror substitution, the fact that a trial court has taken extraordinary precautions, in and of itself, is insufficient to rebut the presumption of prejudice to the defendant's right to a fair trial. *See id.* at 590. Rather, an appellate court must be satisfied that "under the circumstances of the case, the precautions were adequate to achieve that result." *Id.* We are satisfied that under the unusual circumstances of this case, the trial court's precautions were adequate to rebut the presumption of prejudice to Carrillo.

## V. Conclusion

For the reasons stated in this opinion, we affirm the judgment of the court of appeals.