24CA0943 Peo v Jelks 04-23-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0943
Arapahoe County District Court No. 23CR2252
Honorable Darren Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Deyshai Jelks,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 23, 2026

---

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

R. Scott Reisch, Alternate Defense Counsel, Robert F. LeVeen, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Deyshai Jelks, appeals his convictions for criminal attempt to disarm a peace officer and the lesser nonincluded offense of resisting arrest. For the following reasons, we affirm.

## I.     Background

¶ 2     On August 16, 2023, Jelks asked to meet with his parole officer, Nichole Jimenez. Parole office staff informed Jimenez that Jelks wished to see her and that he had an axe and a butane cannister attached to his backpack. Jimenez went outside to locate Jelks, asked him to come inside the office, and directed him to an area where they could meet privately. Neither the axe nor the cannister were visible to Jimenez. Jimenez asked Jelks to remove his backpack so she could conduct a pat-down search, but he did not comply. The axe then fell from Jelks' backpack when he made a sudden move.

¶ 3     As Jimenez kicked the axe out of reach and told Jelks he was "making [her] nervous," another parole officer arrived to monitor the situation. Jimenez told Jelks to put his hands on the wall so she could search him, but his disobedience led four additional parole officers to assist. One officer ordered Jelks to the ground and when he did not comply, two officers tased him. The tasing was

ineffective and a physical struggle ensued as the officers tried to handcuff Jelks. Jelks allegedly grabbed an officer's arm, kicked an officer's leg, and reached for a taser.

¶ 4     The People charged Jelks with two counts of second degree assault, § 18-3-203(1)(f), C.R.S. 2025, and one count of criminal attempt to disarm a peace officer, §§ 18-8-116, 18-2-101, C.R.S. 2025. At trial, the jury viewed surveillance footage of the incident. The jury acquitted Jelks of the assault charges but convicted him of criminal attempt to disarm a peace officer and the lesser nonincluded offense of resisting arrest. The trial court then sentenced Jelks to three years in the custody of the Colorado Department of Corrections (CDOC).

¶ 5     On appeal, Jelks argues that (1) the trial court erred by denying his requested jury instructions on (a) reasonable doubt and (b) body cameras worn by peace officers; (2) the court failed to overcome the presumption of prejudice that arose after a mid-deliberation juror substitution; and (3) the trial judge should have recused himself because he presided over a *People v. Bergerud*, 223 P.3d 686 (Colo. 2010), hearing where he held Jelks in contempt. We reject each contention and affirm the judgment of conviction.

2

## II.  Jury Instructions

### A.  Additional Background

¶ 6    Before 2022, the model criminal jury instructions defined proof beyond a reasonable doubt as follows:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

COLJI-Crim. E:03 (2021).

¶ 7    The model instruction current at the time of trial, revised substantially in 2022, provided:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. But if you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

COLJI-Crim. E:03 (2022).

¶ 8    At the start of trial and again during the jury instruction conference, Jelks asked the court to provide the jury with the old "reasonable doubt" instruction. Jelks argued that the revised

version "impermissibly and unconstitutionally lower[ed] the burden of proof." The trial court declined Jelks' request, explaining it had routinely used the new instruction and that, while at the time a Colorado appellate court had yet to address the instruction's validity, the new language "had the blessing" of the Tenth Circuit and the United States Supreme Court. Consistent with this ruling, the trial court provided the 2022 instruction to the jury.

¶ 9     Jelks proposed another instruction based on section 24-31-902(1)(a)(II)(A), C.R.S. 2025, stating that "a peace officer shall wear and activate a body-worn camera during any interaction with the public initiated by the peace officer . . . for the purpose of enforcing the law or investigating potential violations of the law." The instruction advised that the parole officers failed to record their interaction with Jelks and instructed the jury to infer that the missing body-camera footage reflected misconduct by law enforcement. The trial court found that the statute undergirding the requested instruction did not apply to parole officers and declined Jelks' request.

¶ 10     Jelks argues on appeal that the trial court erroneously denied both instructions. We discern no error.

4

## B.     Standard of Review

¶ 11     "The trial court has broad discretion to formulate jury instructions as long as they are correct statements of the law." *People v. Carter*, 2015 COA 24M-2, ¶ 39 (quoting *People v. Oram*, 217 P.3d 883, 893 (Colo. App. 2009)).  While we review de novo whether jury instructions accurately inform the jury of the governing law, we review the trial court's decision to give a particular instruction for an abuse of discretion.  *Id.*  A court abuses its discretion when it misapplies the law or acts in an arbitrary, unreasonable, or unfair manner.  *Id.* at ¶ 27.

### C.     Applicable Law and Analysis

#### 1.     Reasonable Doubt Instruction

¶ 12     Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *McCoy v. People*, 2019 CO 44, ¶ 20 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  The reasonable doubt standard "provides concrete substance for the presumption of innocence," and thus, "the court must properly instruct the jury on — and, as the fact finder, the jury must apply — the reasonable doubt standard."  *Tibbels v. People*, 2022 CO 1,

¶¶ 24-25 (citation omitted). While a trial court retains some flexibility in defining reasonable doubt, it must guard against defining it "in a way that allows the jury to convict on a lesser showing than due process requires." *Id.* at ¶ 25.

¶ 13     Jelks posits that the 2022 instruction impermissibly lowered the People's burden of proof and primed the jury to find Jelks guilty by shifting the focus from "doubt" to "guilt." This argument fails.

¶ 14     We acknowledge that Jelks filed his opening brief before a Colorado appellate court addressed the validity of the 2022 instruction, but we now have the benefit of decisions rejecting arguments similar to those Jelks raises here. *See, e.g., People v. Schlehuber*, 2025 COA 50, ¶ 30 (collecting federal cases); *People v. Melara*, 2025 COA 48, ¶ 30. In *Schlehuber*, ¶ 2, a division of this court held that the 2022 instruction "does not unconstitutionally lower the prosecution's burden of proof, violate the presumption of innocence, or shift the burden of proof to the defendant." *See also Melara*, ¶ 24 (concluding the 2022 instruction did not impermissibly lower the burden of proof). And in *People v. Berumen*, 2025 COA 93, ¶ 22, the division concluded "that the 2022 model instruction is an accurate statement of the law." We are not

persuaded to reject the analysis in *Schlehuber, Melara,* or *Berumen.* Thus, the instruction challenged here accurately stated the "reasonable doubt" standard, and the trial court did not abuse its discretion when it declined to give the pre-2022 instruction.

### 2. Body-Worn Camera Instruction

¶ 15    Section 24-31-902(1)(a)(II)(A) provides that "a peace officer shall wear and activate a body-worn camera . . . during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law."  A "peace officer" is "any person *employed by a political subdivision of the state* required to be certified by the [Peace Officers Standards and Training (POST)] board[,] . . . a Colorado state patrol officer[,] . . . and any noncertified deputy sheriff."  § 24-31-901(3), C.R.S. 2025 (emphasis added).  While the statute does not define "political subdivision," Black's Law Dictionary is instructive: A "political subdivision" is "[a] division of a state that exists primarily to discharge some function of local government."  Black's Law Dictionary 1402 (12th ed. 2024); *see also People v. Hollis,* 2025 CO 54, ¶ 22 (courts may look to

7

recognized dictionaries for assistance in interpreting statutory language).

¶ 16     Jelks argues that the statute is applicable because parole officers are subject to certification by the POST board.  But this position ignores half of the requirement: An individual subject to POST certification must also be "employed by a political subdivision of the state."  § 24-31-901(3).  The CDOC employs community parole officers, §§ 16-2.5-136, 17-27-102(3.5), C.R.S. 2025, and is not a political subdivision of the state because it does not discharge a function of local government.  *Aguilar v. Colo. State Penitentiary*, 656 F. App'x 400, 402 (10th Cir. 2016) ("The CDOC is an 'arm' or 'instrumentality' of the State of Colorado, rather than a political subdivision of the state . . . .").  Thus, section 24-31-902 is inapplicable here, and the trial court did not abuse its discretion by declining Jelks' proposed instruction.  *See Carter,* ¶ 27.

### III.   Juror Substitution

#### A.    Additional Background

¶ 17     After the second day of trial, before the court sent the jury to deliberate, the court identified which juror would serve as an alternate.  The court told the alternate that she was to continue "to

8

follow all of the orders" in the case until she was formally discharged and cautioned that she could "be put into deliberations" if "one of the jurors were to take ill or have an accident or something." The alternate then went home. Around 5 p.m., after an hour and a half of deliberating, the jury sent two questions to the court: "[I]f we cannot come to a decision on one charge, does that impact the entire trial/all charges?" and "[H]ow long should we deliberate before determining on an impasse?" The court gave the questions to the parties, dismissed the jury for the evening, and told the parties they could answer the questions when the jury returned the next day.

¶ 18 The following morning, a juror called in sick. The court told the parties that it tried unsuccessfully to reach the alternate and provided three options: (1) the parties could agree to proceed with eleven jurors; (2) the court could continue to call the alternate; or (3) the jury could resume deliberations the following day with the juror "who's ill today." Defense counsel asked to take a break to evaluate the options. After the break, the court informed the parties that it was able to contact the alternate and that she was on her way to the courthouse. The People indicated its preference for

deliberations to continue with the alternate, while defense counsel objected to the substitution.

¶ 19 Despite the objection, the court proceeded with the alternate. When she arrived, the court explained to the alternate and the original jurors that they had to "start deliberations anew," pick a new foreperson, rewatch any videos they viewed the previous day, and refrain from comments such as "we already decided this. We already decided that." In response to a juror's inquiry about the questions they submitted the night before, the court said, "[E]verything is starting over. So ignore the question, ignore the answer, and start new." Each original juror indicated that they understood the procedure and could disregard their previous conversations. The alternate expressed a similar understanding and said she would inform the court if the jury engaged in improper discussions about their previous deliberations. After two hours, the newly impaneled jury reached a verdict.

¶ 20 Jelks speculates that the original jury reached a partial verdict on the second day of trial and argues that the court did not take adequate measures to overcome the presumption of prejudice that

arose from the mid-deliberation substitution. We conclude the record rebuts any such presumption.

## B. Standard of Review

¶ 21 Appellate courts "presume that a mid-deliberations substitution of a regular juror with an alternate juror always prejudices the defendant." *Castro v. People*, 2024 CO 56, ¶ 73. Thus, the only relevant inquiry is whether the substitution requires reversal. *Id.* This question turns on whether "the precautions employed by the trial court, when considered in light of the surrounding circumstances, overcome the presumption of prejudice to the defendant" and "protect [the defendant's] right to a fair trial." *Id.* at ¶¶ 73-74.

## C. Applicable Law and Analysis

¶ 22 "Every person accused of a felony has the right to be tried by a jury of twelve." Crim. P. 23(a)(1). The trial court "may direct that a sufficient number of jurors in addition to the regular jury be called and impaneled to sit as alternate jurors . . . [if regular jurors] become unable or disqualified to perform their duties." § 16-10-105, C.R.S. 2025. Our supreme court has held that the substitution of a juror mid-deliberation "raises a presumption of

11

prejudice to the defendant's right to a fair trial, [which] may be overcome by an adequate showing that procedural precautions taken by the trial court obviated the danger of prejudice to the defendant." *People v. Burnette*, 775 P.2d 583, 588 (Colo. 1989).

¶ 23    The precautions a trial court may take include

- informing the alternate that she is not discharged and must continue to follow the court's instructions;

- questioning the alternate about her activities between being released and returning as an alternate;

- instructing the original jurors that they must begin deliberations anew;

- asking the original jurors individually if they can start over and render a fair verdict unimpaired by the substitution; and

- asking the alternate if she can render a fair verdict.

*Id.* at 590-91. While not dispositive, "[c]omparing the time the original jury and the reconstituted jury spent in deliberations" is also relevant to the inquiry. *Castro*, ¶ 80.

¶ 24    Here, the trial court informed the alternate juror at the close of trial that she was not yet discharged, she must continue to follow

orders of the court, and she may be called in to deliberate. The following morning, after the twelfth juror called in sick, the court informed the original jury and the alternate juror that they must start over with deliberations rather than resume where they left off. Each juror then assured the court that they were able to begin anew. Although the record does not indicate that the court questioned the alternate juror about her activities between her release and return the next morning, only a brief amount of time passed, and we are satisfied with the court's approach to the substitution. *See Carrillo v. People*, 974 P.2d 478, 492-93 (Colo. 1999) (recognizing that the trial court's instructions to the original jurors about a substitution fell short of the precise approach suggested in *Burnette*, but in light of other factors, the court took adequate precautions). Finally, the reconstituted jury deliberated slightly longer than the original jury and acquitted Jelks of the most serious charges. *See Castro*, ¶¶ 78-79. We therefore conclude that the trial court took adequate measures and rebutted any presumption of prejudice that arose from the substitution. *See id.* at ¶¶ 75-84; *Carrillo*, 974 P.2d at 491-93.

## IV.  Alleged Court Bias

### A.  Additional Background

¶ 25    Jelks' case was originally assigned to Judge Whitfield.  During pretrial proceedings, Jelks filed a pro se motion for new counsel and the public defender filed a motion for an ex parte *Bergerud* hearing on Jelks' ineffective assistance of counsel claims.  Judge Whitfield transferred the motion to Judge Vahle to preside over the *Bergerud* hearing.

¶ 26    At the close of the hearing, Judge Vahle found that there was not a "conflict of interest at all, much less one that [would cause him to] remove the Public Defender."  The following exchange then occurred:

> Jelks: (Indiscernible) motherfucking, stupid ass.
>
> The Court: Mr. Jelks, if you want to add time on the front of whatever sentence you're facing, you just keep talking like that in my courtroom.
>
> Jelks: I will.
>
> The Court: Okay.  Because I'll hold you in contempt and —
>
> Jelks: Hold me in contempt.

> The Court: All right. I'm finding you in contempt.
>
> Jelks: I bet you are.

¶ 27    Judge Vahle proceeded directly to sentencing for the contempt violation and sentenced Jelks to ninety days in jail "consecutive to any sentence out of this case." Judge Vahle then returned the case to Judge Whitfield.

¶ 28    Due to a scheduling conflict involving Judge Whitfield, Judge Vahle presided over Jelks' trial and sentencing hearing. At sentencing, Judge Vahle indeed made note of Jelks' behavior at the *Bergerud* hearing, yet he shortened the contempt sentence, awarded credit for forty-four days served, and stated, "[T]he contempt sentence is done as of today." As to the underlying conviction, Judge Vahle sentenced Jelks to three years in CDOC's custody due to his repeat offender status but awarded additional credit for time served and expressed hope for Jelks' future rehabilitation.

¶ 29    Jelks argues that Judge Vahle should have recused himself or otherwise been disqualified from presiding over trial because the exchange that occurred at the *Bergerud* hearing gave rise to bias against Jelks. We disagree.

## B. Standard of Review

¶ 30 Jelks did not object to Judge Vahle presiding over trial and did not timely move for his disqualification or recusal. As a result, he has waived any argument that Judge Vahle should have recused based on the *appearance* of partiality, as opposed to actual bias or prejudice. *See People v. Dobler*, 2015 COA 25, ¶ 7; *see also People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011) ("Because the concern is the reputation of the judiciary rather than protection of the parties, litigants may waive disqualification when the disqualification is not for reasons of actual bias or prejudice."); *People v. Jennings*, 2021 COA 112, ¶ 26 (explaining a "claim of actual judicial bias cannot be waived").

¶ 31 We review questions of disqualification de novo. *Jennings*, ¶ 27. "Judicial bias against a criminal defendant constitutes structural error requiring reversal." *People v. Schupper*, 2014 COA 80M, ¶ 56.

## C. Applicable Law and Analysis

¶ 32 A judge "shall be disqualified to hear or try a case if . . . [h]e is in any way interested or prejudiced with respect to the case, the parties, or counsel." § 16-6-201(1)(d), C.R.S. 2025. Relatedly, the

16

Colorado Code of Judicial Conduct provides that a judge should disqualify himself "in any proceeding in which the judge's impartiality might be reasonably questioned," including when the judge has "a personal bias or prejudice concerning a party."  C.J.C. 2.11(A)(1).

¶ 33    The requirement is tempered by the "extrajudicial source doctrine," which protects a judge from disqualification "based on knowledge gained in the course of h[is] judicial duties."  *People v. Roehrs*, 2019 COA 31, ¶ 22.  As relevant here, the doctrine applies when a defendant seeks to disqualify a judge on the basis that the judge previously ruled against him.  *People v. Boehmer*, 767 P.2d 787, 790 (Colo. App. 1988).  Moreover, while alleged bias is merely grounds for recusal, "only when the judge was actually biased will [an appellate court] question the *result*."  *People v. Garcia*, 2024 CO 41M, ¶ 21 (quoting *Sanders v. People*, 2024 CO 33, ¶ 50).  Actual bias prevents a judge from dealing fairly and impartially with a party.  *Jennings*, ¶ 20.  The defendant bears the burden of establishing that "the judge had a substantial bent of mind against him," and such accusations must be clearly established in the record.  *Id.* at ¶ 28 (citation omitted).

17

¶ 34   We first reject Jelks' contention that Judge Vahle should have recused himself or otherwise been disqualified from presiding over trial. The factual premise of Jelks' allegation — the verbal exchange at the *Bergerud* hearing that led to the contempt sanction — occurred while Judge Vahle undertook judicial duties, and thus any alleged bias did not stem from an outside source. *See Roehrs*, ¶ 22; *Boehmer*, 767 P.2d at 790; *Liteky v. United States*, 510 U.S. 540, 550-51 (1994). The extrajudicial source doctrine applies under these circumstances and, therefore, Judge Vahle was not required to recuse or otherwise subject to disqualification.[1] *See Roehrs*, ¶ 22; *Boehmer*, 767 P.2d at 790; *Liteky v. United States*, 510 U.S. 540, 550-51 (1994).

¶ 35   Finally, the record is devoid of any indication that Judge Vahle exhibited actual bias against Jelks. On the contrary, he substantially reduced Jelks' contempt sentence, awarded credit for time served to the underlying offense, and offered words of

---

[1] To the extent Jelks also argues that Judge Vahle's act of presiding over the *Bergerud* hearing, by itself, prevented him from also presiding over the trial, a division of this court recently rejected this argument. *People v. Palermo*, 2026 COA 12, ¶¶ 14-18. We agree with the *Palermo* division's analysis and perceive no reason to depart from it here.

encouragement for Jelks' continued rehabilitation. And to the extent that Judge Vahle's comments about Jelks' frustration and explosive temper had some connection to his behavior at the *Bergerud* hearing, this alone does not give rise to actual bias. *See Jennings*, ¶¶ 32-33 (concluding that the trial judge's comment that the defendant is "a very difficult client" was not actually biased or prejudiced; rather, it was based on events that occurred throughout the proceeding). Thus, we have no reason to disturb the trial court's judgment or sentence imposed. *See Garcia*, ¶ 21.

## V. Disposition

¶ 36 The judgment is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.