21CA0949 Peo v Salazar 10-17-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA0949
Jefferson County District Court No. 20CR973
Honorable Jason Carrithers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Raymond Jose Salazar,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE KUHN
Freyre and Yun, JJ., concur

Prior Opinion Announced October 12, 2023, Vacated in 23SC824

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

---

Philip J. Weiser, Attorney General, Patrick A. Withers, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meghan M. Morris, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Raymond Jose Salazar, appeals the judgment of conviction entered upon a jury verdict finding him guilty of second degree kidnapping, reckless driving, and reckless endangerment. Salazar also appeals the trial court's order adjudicating him a habitual domestic violence offender under section 18-6-801(7), C.R.S. 2024.  We affirm.

## I.     Background

¶ 2     One morning, Salazar's ex-partner and the mother of his four children, C.R. (the victim), was preparing to take their daughter to school in Lakewood and then to go to Aurora where she was attending nursing school.  The victim went outside to warm up the car that she and Salazar still jointly owned.  While the car was running, the victim briefly returned to the house to get backpacks and other school items she and her daughter needed that day.  On the way out, the victim saw Salazar in the driver's seat.

¶ 3     Salazar told the victim that he wanted to drive her and their daughter to their respective schools.  The victim initially declined, but after a brief argument, she decided to let him drive.

¶ 4     After dropping off their daughter at school, Salazar's attitude toward the victim changed.  He started accusing her of cheating on

him, and instead of taking her to nursing school in Aurora — as initially promised — Salazar drove them toward Wheat Ridge where he believed the person she was cheating on him with lived.

¶ 5    On the way there, Salazar became increasingly aggressive. He was speeding and weaving through traffic. The victim testified at trial that Salazar incessantly accused her of infidelity, called her a "bitch" and "whore" on several occasions, and threatened to "punch [her] in the mouth" if she wouldn't tell him the truth about who she had been seeing.

¶ 6    The victim repeatedly pleaded with Salazar to pull over and let her out of the car. Salazar refused and told her that she's "not going anywhere until [she] tell[s] him the truth." The victim then attempted to jump out of the car on two occasions. Her first attempt failed because Salazar grabbed her and forced her back into the car. But the victim managed to escape when Salazar stopped in traffic. She ran to the parking lot of a nearby truck dealership and hid among the trucks while Salazar looked for her. She called 911 and told the operator what had happened to her.

¶ 7    A Wheat Ridge police officer responded to the scene. The victim said that Salazar had kidnapped her and that he had stolen

2

her car. A few days later, however, the victim talked to other officers from the Wheat Ridge and Denver Police Departments. In those conversations, she recanted and said she had lied about the kidnapping and that she didn't want to press charges against Salazar.

¶ 8 The District Attorney's Office (DA's Office) in Denver declined to prosecute Salazar. But the Jefferson County DA's Office charged Salazar with second degree kidnapping, criminal mischief, reckless driving, reckless endangerment, and domestic violence — habitual offender. At trial, the victim testified consistently with her original account of the incident. The jury acquitted Salazar of criminal mischief but convicted him of felony second degree kidnapping, reckless driving, and reckless endangerment. It also found that the second degree kidnapping and reckless endangerment convictions included acts of domestic violence. And because Salazar had three prior domestic violence convictions, the court adjudicated him a habitual domestic violence offender under section 18-6-801(7).

¶ 9 The court sentenced Salazar to six years in the custody of the Colorado Department of Corrections for the kidnapping conviction and habitual domestic violence offender adjudication and to

concurrent ninety-day jail sentences for the reckless driving and reckless endangerment convictions.

## II. Analysis

¶ 10     Salazar contends that the trial court reversibly erred in five distinct ways, by (1) denying his for-cause challenge to a juror; (2) permitting the prosecutor to commit misconduct by referring to a pretrial screening process during voir dire and eliciting screening testimony from a police officer at trial; (3) admitting that officer's testimony; (4) incorrectly defining "seized and carried" in the jury instruction for second degree kidnapping; and (5) admitting police officer testimony on the frequency of victim recantation in domestic violence cases as lay witness testimony.  We disagree with each of these contentions.

### A. For-Cause Challenge to Juror S

¶ 11     Salazar argues first that the trial court abused its discretion by denying his for-cause challenge to Juror S.  We disagree.

#### 1. Additional Background

¶ 12     During voir dire, Juror S disclosed that she had been a victim of domestic violence over four decades ago.  She told defense counsel that Salazar's case "stirred up a lot of memories" and

negative flashbacks "that [she] would . . . rather not remember."  In

light of this statement, counsel inquired further:

> [DEFENSE COUNSEL]: . . .  And knowing that Mr. Salazar has been charged with domestic violence, how do you feel about that today?
>
> [JUROR S]: That's questionable.  I've been thinking about that all morning.  I don't know. I would really feel better hearing both sides of the story.
>
> . . . .
>
> [DEFENSE COUNSEL]: Okay.  And if you hear allegations of domestic violence, are you going to automatically believe them?
>
> [JUROR S]: Yes, I would.
>
> [DEFENSE COUNSEL]: Okay.  And if you don't hear from Mr. Salazar or from [defense counsel], is that going to be difficult for you not hearing both sides of the story?
>
> [JUROR S]: For me, it would be.
>
> [DEFENSE COUNSEL]: Okay.  Tell me why you feel that way.
>
> [JUROR S]: Well, having been in that situation myself, I would feel better if I knew why, you know, what the situation was.  Hopefully it was only one time.  In my case, it was much more than one time.  So what brought it on? Why?
>
> [DEFENSE COUNSEL]: Okay.  And if you don't hear that why or hear from Mr. Salazar his

side of the story, what are you going to be thinking?

[JUROR S]: It would be his choice.

In response to defense counsel's question whether she "fe[lt] like [she] could be a fair and impartial juror," Juror S said that she "would try," but she admitted that it "would probably be difficult" considering her history with domestic violence.

¶ 13     The court continued the examination with a series of rehabilitative questions:

> THE COURT: . . . And so you used the words "try to be fair."  What do you mean by that?
>
> [JUROR S]: I would do my best to try to understand.  I don't know.
>
> . . . .
>
> [JUROR S]: I'm not sure how to answer that, sir.
>
> THE COURT: Well, it's a difficult phrase, so let me try asking a couple other questions.  Who has the burden of proof in this case?
>
> [JUROR S]: In this case, the prosecutor does.
>
> THE COURT: Okay . . . what is the burden of proof?
>
> . . . .

[JUROR S]: Well, I'm taking that they are trying to prove that he did these things wrong.

. . . .

THE COURT: . . . Do you believe you understand what beyond a reasonable doubt means?

[JUROR S]: Yes. Yes.

THE COURT: And in your own words, can you tell me what beyond a reasonable doubt means?

[JUROR S]: You are positive, you are absolutely sure one way or another.

THE COURT: Okay. And in terms of the defendant in this case, what does he have to do in this case as the case heads to trial? Does he have to do anything?

[JUROR S]: I don't know.

THE COURT: Does [the defendant] have to testify?

[JUROR S]: He doesn't have to. It would be his choice.

THE COURT: Okay. And if he chooses not to testify, do you believe you would hold that against him?

[JUROR S]: Possibly.

THE COURT: Okay. What do you mean by possibly?

[JUROR S]: Because . . . I would feel like I would need to know his reasoning for what happened on his side.

The prosecutor then took over the rehabilitation:

[THE PROSECUTOR]: [Juror S], do you think you could follow the law in this case that's presented to you by the judge?

[JUROR S]: Sure.

[THE PROSECUTOR]: Okay. Do you think that -- the judge said the defendant doesn't have to testify, that it is the prosecution's burden to prove beyond a reasonable doubt, that you can just evaluate the evidence the People present and whether we have proven [Salazar's guilt] beyond a reasonable doubt?

[JUROR S]: Yeah.

¶ 14     Juror S's voir dire concluded with defense counsel asking her additional questions about the defendant's constitutional right not to testify and her ability to follow the law:

[DEFENSE COUNSEL]: . . . So when you said that you would possibly hold it against [Salazar], tell me a little bit about that.

[JUROR S]: Do you mean him not testifying?

[DEFENSE COUNSEL]: Yes.

[JUROR S]: Well, I would like -- I know it's his choice, but I would feel better making a decision if I heard from him.

[DEFENSE COUNSEL]: Okay. And it sounds like, based on your prior experiences, that hearing both sides is important to you?

[JUROR S]: Yes, ma'am.

[DEFENSE COUNSEL]: Okay. And I know that you understand the law. . . . But even understanding that law, it's still sometimes difficult to follow based on your experiences and your personal kind of opinion. Is that kind of what's going on for you?

[JUROR S]: Yes.

¶ 15    Defense counsel moved the court to strike Juror S for cause. Counsel argued that Juror S would not be a fair and impartial juror because she would possibly hold it against Salazar if he decided not to testify and because she evinced uncertainty in her ability to follow the law. The court denied this challenge, and Juror S eventually served on the jury.

2.    Standard of Review and Applicable Law

¶ 16    Both the United States and Colorado Constitutions guarantee criminal defendants the right to a trial by an impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. To ensure this right, a trial court must excuse biased or prejudiced persons from the jury. *People v. Young,* 16 P.3d 821, 824 (Colo. 2001).

9

¶ 17    In Colorado, this requirement is codified in section

16-10-103(1)(j), C.R.S. 2024, which provides that a trial court must

sustain a challenge for cause if "the juror evince[s] enmity or bias

toward the defendant or the state."  The statute, however, carves

out an exception to this general rule:

> [N]o person summoned as a juror shall be
> disqualified by reason of a previously formed
> or expressed opinion with reference to the guilt
> or innocence of the accused, if the court is
> satisfied, from the examination of the juror or
> from other evidence, that [the juror] will render
> an impartial verdict according to the law and
> the evidence submitted to the jury at the trial.

*Id.*  This means that a potential juror who previously expressed bias

against a defendant may still serve on the jury if the trial court is

satisfied — after conducting rehabilitative questioning — that the

juror can fairly and impartially serve on the case.  *See People v.*

*Lopez*, 2018 COA 119, ¶ 8.

¶ 18    We review a trial court's denial of a challenge for cause for an

abuse of discretion.  *Carrillo v. People*, 974 P.2d 478, 485 (Colo.

1999).  In doing so, we accord great deference to the trial court's

handling of challenges for cause because the court is in a superior

position to assess the juror's credibility, demeanor, and sincerity in

explaining her state of mind. *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000). We must therefore affirm as long as the trial court's decision fell within a range of reasonable options. *Vigil v. People*, 2019 CO 105, ¶ 14.

### 3. The Trial Court Didn't Err by Denying the Challenge for Cause

¶ 19    Salazar centers his challenge to the trial court's decision on Juror S's final position. Specifically, he asserts that Juror S wasn't properly rehabilitated because, even after rehabilitative questioning, she (1) said that she "would try" to be fair, though she couldn't guarantee it; and (2) maintained that she would possibly hold it against Salazar if he decided not to testify. Salazar concludes that because Juror S remained equivocal about her ability to serve fairly and impartially, the trial court abused its discretion by denying his for-cause challenge.

¶ 20    In essence, Salazar claims that the juror's ambiguous responses were sufficient evidence of bias supporting her exclusion. But we review the trial court's decision for an abuse of discretion. Under that standard, the question for us is not whether the trial record would have supported a decision to grant the challenge for

11

cause or whether we would have granted the challenge. *People v. Vigil*, 2015 COA 88M, ¶ 10, *aff'd*, 2019 CO 105. Rather, the question is whether the record compelled the trial court to grant the challenge. *Id.* And where a juror's responses are only equivocal but do not articulate a *clear expression of bias*, the trial court is not compelled to strike the juror. *Id.* at ¶ 11.

¶ 21 While we acknowledge that this is a close case, we conclude that Juror S didn't clearly evince bias during voir dire. To start, she admitted right out of the gate that she had been a victim of domestic violence and added that she believed that she could be fair to both sides. True, she later told defense counsel that she "would try" to be fair to both sides, and that "would probably be difficult" considering her personal experience with domestic violence. But she never unequivocally said that she couldn't be fair or impartial to Salazar. In response to the court's question to clarify what she meant by saying that she "would try" to be fair, Juror S said that she "would do [her] best to try to understand."

¶ 22 We agree that Juror S's commitment to fair and impartial service could have been expressed in a clearer way. And she did say that she would "possibly" hold it against Salazar if he decided

12

not to testify. But we also note that her final position didn't convey a clear message of bias. At most, she remained uncertain about how her own personal experience with domestic violence would impact her jury service, and she expressed that she would like to understand both sides of the story.

¶ 23     As we already noted, a trial court doesn't abuse its discretion by denying a challenge for cause on an ambiguous record. *Id.*; *see Carrillo*, 974 P.2d at 488 (affirming the trial court's denial of a challenge for cause where the juror's answers were ambiguous but didn't amount to a clear expression of bias); *cf. Nailor v. People*, 612 P.2d 79, 80 (Colo. 1980) (holding that the trial court abused its discretion by denying a challenge for cause where the juror plainly said that she couldn't be fair). And in the absence of clear bias, we defer to the court's following findings, made after the court had the opportunity to evaluate Juror S's demeanor, tone, and credibility:

> I understand the defense's concern. I think
> [Juror S] -- her demeanor was certainly one,
> frankly, I think she could be easily persuaded
> either way. She appeared to be the sort of
> juror who I think could be easily persuaded
> either way, and while she did use some very
> noncommittal language, such as "try" or
> "possibly," she is able to identify the burden,
> she is able to identify the rights and articulate

13

> that she wouldn't hold them against either side, and the Court cannot find a basis for challenge for cause as to [Juror S].

*See Carrillo*, 974 P.2d at 486; *see also Young*, 16 P.3d at 825-26 ("If the juror's recorded responses are unclear[,] only the trial court can assess accurately the juror's intent from the juror's tone of voice, facial expressions, and general demeanor.").

¶ 24 We therefore conclude that, under these circumstances, the trial court didn't abuse its discretion by denying Salazar's for-cause challenge to Juror S.

### B. Prosecutorial Misconduct Claims

¶ 25 Salazar next claims that the prosecutor engaged in reversible misconduct by introducing improper screening evidence during (1) voir dire and (2) the detective's testimony. He likewise contends that the detective's testimony was inadmissible. We perceive no reversible error.

### 1. Standard of Review and Applicable Law

¶ 26 When probable cause is not an issue at trial, it's generally improper to present evidence about charging decisions. *People v. Mendenhall*, 2015 COA 107M, ¶ 62. That's so because this "screening" evidence may suggest that (1) only guilty parties are

14

charged with crimes and thus the defendant must be guilty;
(2) there is additional evidence supporting the defendant's guilt that
is unknown to the jury; and (3) the prosecutor personally believes
in the defendant's guilt. *See Domingo-Gomez v. People*, 125 P.3d
1043, 1052 (Colo. 2005); *Mendenhall*, ¶ 62.

¶ 27 We use a two-step analysis to review prosecutorial misconduct
claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First,
we evaluate whether the prosecutor's conduct was improper under
the totality of the circumstances. *Id.*; *see also People v. McMinn*,
2013 COA 94, ¶ 60. Second, if it was, we determine whether the
misconduct requires reversal under the applicable standard of
review. *Wend*, 235 P.3d at 1089; *People v. Robinson*, 2019 CO 102,
¶ 18.

¶ 28 Because Salazar didn't object to the asserted misconduct at
trial, we review his claims for plain error. *Robinson*, ¶ 19. Under
this standard, we will reverse only when an error was obvious,
substantial, and so undermined the fundamental fairness of the
trial that it casts serious doubt on the reliability of the judgment of
conviction. *Hagos v. People*, 2012 CO 63, ¶ 14. Prosecutorial
misconduct is plain error only if it is flagrantly, glaringly, or

tremendously improper.  *Domingo-Gomez*, 125 P.3d at 1053.  And prosecutorial misconduct rarely constitutes plain error.  *People v. Carter*, 2015 COA 24M-2, ¶ 53.

### 2.    Voir Dire

¶ 29    Salazar first argues that the prosecutor engaged in reversible misconduct during voir dire.  We disagree.

¶ 30    During questioning, the prosecutor asked the prospective jurors about their thoughts on the State pressing charges for domestic violence.  For example, the prosecutor engaged in the following exchange with one juror.

> [PROSECUTOR]: And domestic violence usually happens in the home, so do you think police should be involved?
>
> [PROSPECTIVE JUROR]: Do I think they should be involved?  I think if someone can get involved, it's hard to stop something like that.  You can't see into somebody else's home.  Someone who is kind of an impartial outsider should be involved if that's helpful.
>
> [PROSECUTOR]: And have you ever heard of . . . someone saying pressing charges or dropping charges?
>
> [PROSPECTIVE JUROR]: Yes.
>
> [PROSECUTOR]: And what do you think about when you hear that?

[PROSPECTIVE JUROR]: Pressing charges, you are going through with an allegation. And dropping charges, you want it to all go away, for the police or the law to stop being involved.

[PROSECUTOR]: And do you understand that it's the State and not the victim that decides whether to press charges or drop charges?

[PROSPECTIVE JUROR]: I did not know that. I wasn't really sure if the victim had anything to do with it.

¶ 31 The prosecutor asked similar questions of a number of other potential jurors.

¶ 32 Salazar contends that these questions were improper because "the prosecutor impermissibly told the jury that the State determined that charges were appropriate and thus implied that Mr. Salazar must be guilty." We disagree. The prosecutor's questions generally were preceded by questions about the jurors' opinions on whether police should be involved in domestic disputes. Further, this case involved a victim who recanted and then asked the police not to pursue charges against Salazar. In this context, we discern no misconduct in the prosecutor's attempt to determine the jurors' views on the prosecution pursuing domestic violence

charges against the victim's wishes.  Thus, we disagree that the prosecutor's questions constituted misconduct.

¶ 33     Further, we note that the prosecutor's references to the State's involvement in bringing charges were brief and bare bones.  The prosecutor did not discuss the charging decision process or what must be established before charges are brought.  Instead, the discussions were limited to explaining that the prosecution, and not the victim, makes the charging decision.  We see nothing improper, let alone plainly so, in this questioning.

### 3.     Detective's Testimony on Probable Cause

¶ 34     Salazar argues next that the prosecutor introduced improper screening evidence during the examination of a police officer.  While we agree with Salazar that some of the prosecutor's conduct was improper, we conclude that the error wasn't plain.

### a.     Additional Background

¶ 35     Detective Mark Slavsky, the lead investigator on the case, testified at trial.  During cross-examination, defense counsel highlighted that, except for the victim's inculpatory statements on the day of the incident — which she recanted a few days later — the

detective's investigation didn't yield any concrete evidence tying Salazar to the crimes.

¶ 36    On redirect examination, the prosecutor elicited the following testimony:

> [PROSECUTOR]: [D]id you contact [the] Denver [DA's Office]?
>
> [DETECTIVE SLAVSKY]: I did.
>
> [PROSECUTOR]: And after you contacted Denver, did they tell you if they were going to file charges or not?
>
> [DETECTIVE SLAVSKY]: They told me that they were not.
>
> [PROSECUTOR]: And did you still proceed to present this case to the [Jefferson County] DA's office?
>
> [DETECTIVE SLAVSKY]: I did.
>
> . . . .
>
> [PROSECUTOR]: And why did you present it to the DA's office?
>
> . . . .
>
> [DETECTIVE SLAVSKY]: It is a domestic violence crime, and there was probable cause to believe that Mr. Salazar had committed the crime, and state statutes say that if I have probable cause on a domestic violence crime, that I will make an arrest or obtain an arrest warrant for that individual.

[PROSECUTOR]: So even though [the victim] said she lied, you still believed that you had probable cause?

[DETECTIVE SLAVSKY]: There were other reasons to believe probable cause existed.

### b.     Analysis

¶ 37     Salazar contends that the prosecutor engaged in misconduct by eliciting responses from the detective regarding the existence of probable cause for his arrest because such testimony constituted improper "screening process" testimony.  We agree with Salazar that the testimony was improper, but we conclude that the error wasn't plain.

¶ 38     As already noted, a prosecutor's references to a "pretrial screening process" are improper to the extent that they reveal the prosecutor's personal opinion or hint that additional evidence supporting the defendant's guilt exists.  The colloquy on redirect did just that.  The detective's testimony that even though the victim lied, "[t]here were other reasons to believe probable cause existed" told the jury that the detective — and by extension the prosecutor — had additional evidence of Salazar's guilt.

¶ 39    We therefore conclude that the detective's testimony — and the prosecutor's last question in particular — was improper. Nevertheless, we conclude that the error wasn't plain.

¶ 40    The testimony, when viewed in context, didn't so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. Nor was it flagrantly, glaringly, or tremendously improper. The references to probable cause were brief and fleeting when compared to the entirety of the detective's testimony. They were limited to two questions, the prosecutor didn't ask any follow up questions after the detective answered that "[t]here were other reasons to believe probable cause existed," and there is no indication that the prosecutor referred to probable cause during closing argument or at any other point during the trial. *See Domingo-Gomez*, 125 P.3d at 1053 ("Comments that were 'few in number, momentary in length, and were a very small part of a rather prosaic summation' do not warrant reversal under the plain error standard." (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982))); *People v. Sommers*, 200 P.3d 1089, 1097 (Colo. App. 2008) (concluding that the prosecutor

didn't engage in misconduct where he didn't refer to the challenged statements in closing argument).

¶ 41    We therefore conclude that the trial court didn't plainly err by allowing the prosecutor to elicit improper screening process testimony from the detective.

4.    Admissibility of the Detective's Screening Testimony

¶ 42    Salazar also challenges Detective Slavsky's testimony regarding the existence of probable cause on evidentiary grounds. While we agree that the testimony was inadmissible, we conclude that the error is not reversible.

¶ 43    We conclude that Detective Slavsky's screening testimony wasn't relevant and it shouldn't have been admitted.  *See* CRE 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); CRE 402 ("Evidence which is not relevant is not admissible.").  When probable cause to charge a defendant is not at issue — and it wasn't here — then evidence about probable cause to file charges is irrelevant because it has no rational

tendency to make it more probable that the defendant committed the charged crime. *Mendenhall*, ¶ 62.

¶ 44 The People contend that the testimony was relevant because "the tenor of the defense was that the prosecution had no case once the victim supposedly recanted," and the testimony "helped to dispel the insinuation that the detective was unreasonably pursuing a case against [Salazar]." While we agree with the People that defense counsel's cross-examination implied that the prosecution's case against Salazar was weak, we disagree that this examination opened the door for the detective's testimony about probable cause. The prosecution was entitled to rehabilitate its witness regarding the investigation, but testimony about probable cause to bring charges and the insinuation that there were additional reasons for doing so were not relevant to the question of Salazar's guilt. It was therefore inadmissible.

¶ 45 However, we again conclude that any error doesn't warrant reversal.

¶ 46 Parts of the testimony that Salazar now challenges were not preserved and are reviewed for plain error. *People v. Arzabala*, 2012 COA 99, ¶ 83. Those portions that were preserved are reviewed for

harmless error. An error in the admission of evidence is harmless if, when viewed in light of the entire trial record, it didn't substantially influence the verdict or affect the fairness of the trial proceedings. *People v. Delsordo*, 2014 COA 174, ¶ 7. In contrast, an error is plain if it is obvious, substantial, and so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos*, ¶ 14.

¶ 47 We conclude that the error in admitting the detective's testimony is not reversible under either the plain error or harmless error standard.[1] As noted, Detective Slavsky's statements were brief and constituted a very small part of his entire testimony — and an even smaller part of the roughly 640-page transcript from the three-day trial. *Mendenhall*, ¶ 69 (concluding that the screening testimony was harmless because it was brief and constituted a

---

[1] Salazar stated in his opening brief that this claim wasn't preserved during trial. But his trial counsel did object to the prosecutor's question "[a]nd why did you present [this case] to the DA's office." Thus, the relevance challenge to that question was preserved and we review it for harmless error. *People v. Montoya*, 2022 COA 55M, ¶ 34, *aff'd in part and rev'd in part*, 2024 CO 20; *People v. Tallent*, 2021 CO 68, ¶ 11 (stating that appellate courts have "an independent, affirmative duty to determine whether a claim is preserved and what standard of review should apply").

24

small part of the witness's entire testimony). Additionally, the prosecutor didn't reference the statements at any other point during the trial — including closing argument — or indicate in any way that the fact that the charges were brought after the case was screened meant that Salazar was guilty. *Id.*; *cf. People v. Mullins*, 104 P.3d 299, 302 (Colo. App. 2004) (concluding that the trial court plainly erred by admitting screening testimony where, among other things, the prosecutor referred to the testimony in closing argument).

¶ 48     Under these circumstances, we conclude that the trial court didn't reversibly err by admitting Detective Slavsky's screening testimony.

## C.    The Kidnapping Instruction Wasn't Plainly Erroneous

¶ 49     Salazar next contends that the trial court reversibly erred by incorrectly instructing the jury on the elements of second degree kidnapping. Specifically, he contends that the court's definition of "seized and carried" as "any movement, however short in distance" was plainly erroneous. The People concede that this definition was legally erroneous but argue that reversal is not required because

the error wasn't obvious. Given our supreme court's recent case law, we agree with the People.

¶ 50 According to section 18-3-302(1), C.R.S. 2024, a defendant is guilty of second degree kidnapping if he "knowingly seizes and carries a person from one place to another, without the person's consent and without lawful justification." Although the elemental instruction correctly listed the elements, a separate definitional instruction stated that "[s]eized and [c]arried means any movement, however short in distance."

¶ 51 In February 2022, the supreme court held that such an instruction is erroneous because it (1) eliminates the seizure requirement and (2) improperly changes the meaning of the asportation requirement from carrying a person from one place to another to "any movement, however short in distance." *Garcia v. People*, 2022 CO 6, ¶¶ 25, 27, 29, 35. In light of *Garcia*, and reviewing the jury instruction de novo, *People v. Espinosa*, 2020 COA 63, ¶ 8, we agree with both parties that the trial court's definitional instruction was erroneous under current precedent.

¶ 52 We also agree with the parties that this issue wasn't preserved at trial. We review unpreserved errors for plain error and reverse

only if the error is both obvious and substantial, such that it so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos,* ¶ 14. To qualify as a plain error, an error generally has to be so obvious that a trial judge can avoid it without the benefit of an objection. *Scott v. People*, 2017 CO 16, ¶ 16. For this to be the case, an error must usually "contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." *Id.* (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40). In general, an error is not obvious "when either [the supreme court] or a division of [our] court . . . has previously rejected an argument being advanced by a subsequent party who is asserting plain error." *Id.* at ¶ 17. In that case, "the trial judge is bound to follow the decisions of the appellate courts and cannot generally be faulted for not departing from that authority sua sponte." *Id.*

¶ 53   Salazar argues that, in situations where the law changed between the trial and appeal, we should look to the law at the time of appeal to determine whether the error was obvious. For this proposition, he cites *People v. Crabtree*, a case in which a division of our court concluded that we look at the state of the law at the time

of appeal — and not the time of trial — to determine whether an error was obvious. 2022 COA 73, ¶¶ 50-51, *rev'd*, 2024 CO 40M (*Crabtree I*).

¶ 54    In *Crabtree I*, the division adopted the rule articulated by the United States Supreme Court in *Johnson v. United States*, 520 U.S. 461 (1997). *Crabtree I*, ¶ 51. In that case, the Court said that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468. So, the division in *Crabtree I* concluded, "*Johnson* governs plain error review in Colorado when the applicable law was settled at the time of trial but not when the applicable law was not settled at the time of trial." *Crabtree I*, ¶ 47. In doing so, the division rejected the People's argument that, under *Scott*, the obviousness of an error must be evaluated at the time of trial instead of at the time of appeal. *Id.* at 51. The division reasoned that *Scott* wasn't controlling on this issue in part because it didn't squarely address it. *Id.*

¶ 55    In our first opinion, we reversed Salazar's kidnapping conviction and remanded the matter for a new trial after concluding

28

that the trial court's error in its definitional instruction was both

obvious and substantial. *People v. Salazar*, slip. op. at ¶ 61 (Colo.

App. No. 21CA0949, Oct. 12, 2023) (not published pursuant to

C.A.R. 35(e)). We relied on *Scott*, not *Crabtree I* or *Johnson*, to

conclude that the error was obvious. We said that

> [r]egardless of whether *Johnson* applies, the supreme court explicitly noted an exception to the obviousness rule in *Scott*: when an argument has been rejected by the supreme court or our court, an error is not obvious "subject to limited exceptions (e.g., intervening authority from a higher court overruling prior precedent)." *Scott*, ¶ 17.

*Salazar*, No. 21CA0949, slip op. at ¶ 55. We then observed that the

limited exception to the obviousness rule applied in this case

because the supreme court's decision in *Garcia* constituted an

"intervening authority from a higher court overruling prior

precedent" that had upheld the now erroneous instruction. *Id.* at

¶¶ 55-56.

¶ 56    But after we announced our first opinion, the supreme court

clarified the temporal limits of plain error review in *People v.*

*Crabtree*, 2024 CO 40M (*Crabtree II*). The court held that, under

Colorado law, an error is plain if it's obvious at the time of trial, not

at the time of appeal. *Id.* at ¶ 53. In support of this holding, the court observed that, "dating back to *Scott*, [the court has] explained that plainness refers to how obvious or clear-cut an error is at the time it is made." *Id.* at ¶ 53-54 (collecting supreme court and court of appeals cases that applied the time-of-trial rule). The court therefore concluded that the *Crabtree I* division erred by relying on *Johnson* to conclude that an error is obvious when settled law changes during the pendency of a defendant's appeal. *Id.* at ¶ 48.

¶ 57 After announcing *Crabtree II*, the supreme court granted the People's writ of certiorari. It vacated our first opinion and remanded the case for us to reconsider in light of *Crabtree II*. *People v. Salazar*, (Colo. No. 23SC824, Sept. 3, 2024) (unpublished order).

¶ 58 Consistent with *Crabtree II*, we now conclude that the instructional error here wasn't plain because it wasn't obvious at the time of Salazar's trial. As Salazar himself points out — and as we note above — at least three published opinions from divisions of this court had upheld the challenged jury instruction before the trial court gave it during Salazar's trial. *See People v. Owens*, 97 P.3d 227, 237 (Colo. App. 2004), *overruled by Garcia*, 2022 CO 6;

30

*People v. Rogers*, 220 P.3d 931, 936-37 (Colo. App. 2008), *overruled by Garcia*, 2022 CO 6; *People v. Bondsteel*, 2015 COA 165, ¶¶ 109, 116, 118, *aff'd*, 2019 CO 26, *and overruled by Garcia*, 2022 CO 6. Thus, at the time of trial, no clear statutory command, well-settled legal principle, or Colorado case law would have alerted the court that the definition of "seized and carried" as "any movement, however short in distance," was improper. *See Scott*, ¶ 17. And even though the supreme court decided that this kind of instruction is improper during the pendency of Salazar's appeal, *Crabtree II* requires us to look at the state of the law as it existed at the time of the error, not the time of his appeal.

¶ 59 Accordingly, because the instructional error wasn't obvious at the time the trial court made it, the error wasn't plain. *See Crabtree II*, ¶ 53. And because Salazar doesn't satisfy the first prong of plain error review, the error here is not reversible. *See id.* at ¶¶ 41-43 (noting that an error is plain only if it's both obvious *and* substantial).

### D. Improper Lay Witness Testimony Claim

¶ 60 Finally, Salazar contends that the trial court reversibly erred by admitting, as a lay opinion, testimony from several police officers

regarding the prevalence of victim recantation in domestic violence cases.  We perceive no reversible error.

### 1.    Additional Background

¶ 61    On redirect examination of Detective Slavsky, the prosecutor asked whether, "based on [his] experience," he was "surprised" that the victim had recanted her previous statements.  Detective Slavsky answered "not at all."

¶ 62    The prosecutor asked a similar question of three police officers who the defense had called to the stand as part of its case-in-chief.  During cross-examination, the prosecutor asked Officer Kristine Caston and Corporal Jason Moore about their experience in working with victims of domestic violence and whether it was "common for them to recant their story" and then change it back to the original account of the event.  Officer Caston answered, "[Y]es, it is," whereas Corporal Moore said, "I would not say it's common, but I would also not say it's rare," "I have seen it before."  Finally, the prosecutor asked Officer Joshua Huerta during cross-examination whether the officer "[had] ever seen a domestic violence victim such as this recant their story."  Officer Huerta said, "Not to this extent,"

but he noted that he had seen victims recant their story and then change it back to the original account of the incident.

> ### 2. Standard of Review and Applicable Law

¶ 63      We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Murphy*, 2021 CO 22, ¶ 16. The court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.* Whether the trial court abused its discretion in this case turns on whether the police officers' testimony constituted improper lay opinion testimony under CRE 701. *See People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002), *as modified on denial of reh'g* (Sept. 23), *and modified on denial of reh'g* (Oct. 15, 2002).

¶ 64      Under CRE 701, testimony is proper lay opinion testimony when it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In turn, CRE 702 provides that expert testimony is testimony based on "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."

¶ 65    "[I]n determining whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion." *Venalonzo v. People*, 2017 CO 9, ¶ 23. "If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony." *Id.* In contrast, expert testimony is testimony that "goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have." *Id.* at ¶ 22.

### 3. The Trial Court Didn't Reversibly Err by Admitting the Officers' Testimony

¶ 66    The People contend that CRE 701 doesn't apply to Detective Slavsky's and Officer Huerta's testimony because they were not opinions. Instead, they simply relayed facts without conveying any opinions. We agree on this record. Detective Slavsky testified that he wasn't surprised when the victim recanted, and Officer Huerta testified that he had seen recantation before, though not to this extent. Aside from conveying their reactions and observations, the record doesn't show that either officer expressed any "view, judgment, or appraisal" as to their significance or meaning. *See*

*People v. Warrick*, 284 P.3d 139, 146 (Colo. App. 2011) (concluding that a police officer's testimony that a crime was a felony under a statute wasn't an opinion where the officer didn't express any "view, judgment, or appraisal" on the statute's applicability or meaning).

¶ 67 However, we don't agree with the People's further contention that Officer Caston's and Corporal Moore's statements were proper lay opinions under Rule 701. The People argue that the cycle of domestic violence has entered our pop culture and that it has become a common occurrence in the lives of many people. Maybe so. But in our view, opinions regarding the *prevalence* of domestic violence victims' recantation are still outside the purview of an ordinary person's knowledge and experience. Rather, such observations are based on specialized knowledge and experience not possessed by ordinary persons. *See State v. Gonzalez*, 834 A.2d 354, 358 (N.H. 2003) ("The tendency or frequency of sexual abuse victims' denials and recantations are not observations that any layperson is capable of making, but rather require special experience and knowledge not possessed by the public at large."); *cf. People v. Johnson*, 74 P.3d 349, 353 (Colo. App. 2002) (stating

that *expert testimony* on the frequency of victim recantation is admissible in domestic violence cases).

¶ 68 We therefore conclude that because Officer Caston's and Corporal Moore's statements were based on specialized knowledge, they were not proper lay opinion testimony. But we also conclude that any error in this regard is not reversible.

¶ 69 At trial, Salazar objected to Officer Caston's testimony but didn't object to Corporal Moore's statements. Thus, we review the former statements for nonconstitutional harmless error, and the latter for plain error. *People v. Montoya*, 2022 COA 55M, ¶ 34, *aff'd in part and rev'd in part*, 2024 CO 20; *Arzabala*, ¶ 83. Reversal is not required under either standard.

¶ 70 Although the victim recanted her original account of the event, multiple other witnesses corroborated her story. *See People v. Daley*, 2021 COA 85, ¶ 98 (concluding that the trial court's error in admitting testimony that bolstered the victim's account of the incident was harmless when proper corroboration was accomplished through the testimony of several other witnesses). Further, the improperly admitted statements were brief and, combined, they covered about two pages of transcript from the

three-day trial. *Id.* ("The fact that improperly admitted testimony was brief and fleeting supports a conclusion that it was harmless."); *cf. People v. Garrison*, 2017 COA 107, ¶ 59 (concluding that the trial court's error in admitting improper lay opinion wasn't harmless because the testimony wasn't brief).

¶ 71    The record also shows that the statements were confined to the two cross-examinations and that the prosecutor didn't rely on them either directly or indirectly in her closing argument. *Marsh v. People*, 2017 CO 10M, ¶ 42. Finally, Salazar had the opportunity to alleviate any prejudicial effect of the statements on rebuttal. *See People v. Ayala*, 919 P.2d 830, 833 (Colo. App. 1995) (concluding that the trial court's error in admitting testimony was harmless because the defendant had an opportunity to cross-examine the witness).

¶ 72    Under these circumstances, we conclude that any error in admitting Officer Caston's and Corporal Moore's improper lay opinion testimony is not reversible.

### III.    Disposition

¶ 73    The judgment is affirmed.

JUDGE FREYRE and JUDGE YUN concur.