24CA0360 Peo in Interest of ASN 10-31-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0360
La Plata County District Court No. 22JV21
Honorable Kim Soon Shropshire, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of A.S.N., a Child,

and Concerning M.B. and K.M.P.,

Appellants.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 31, 2024

---

Sheryl Rogers, County Attorney, Katie A. Dittelberger, Assistant County Attorney, Durango, Colorado, for Appellee

Rachel D. Muhonen, Guardian Ad Litem

Elizabeth A. McClintock, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant M.B.

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant K.M.P.

¶ 1    In this dependency and neglect action, K.M.P. (mother) and M.B. (father) appeal the judgment terminating their parent-child legal relationships with A.S.N. (the child).  We affirm.

## I.    Background

¶ 2    The Archuleta County Department of Human Services filed a petition in dependency and neglect, alleging that the child was born affected by illegal substances and expressing concern about domestic violence in father and mother's relationship.  The juvenile court adjudicated the child dependent and neglected.  The court also adopted a treatment plan for mother.

¶ 3    At mother and father's request, venue was changed to La Plata County.  The juvenile court there adopted a treatment plan for father.  After an additional safety assessment, the La Plata County Department of Human Services (the Department) requested mother's and father's treatment plans be amended to address concerns about domestic violence.  After a contested hearing, the court amended the treatment plans.

¶ 4    The Department later moved to terminate both parents' parental rights.  Almost two years after the petition was filed, the juvenile court granted the motion.

1

## II. Appropriate Treatment Plan

¶ 5 Father contends that the juvenile court erred by finding that his treatment plan was appropriate when it included a requirement that he address domestic violence concerns. We disagree.

### A. Standard of Review and Applicable Law

¶ 6 Except in some limited circumstances not applicable here, a juvenile court must adopt an appropriate treatment plan for a parent following a dispositional hearing. § 19-3-508(1)(e)(I), C.R.S. 2024; *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 15. The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family. *People in Interest of L.M.*, 2018 COA 57M, ¶ 25. Therefore, an appropriate treatment plan is one that is approved by the court, relates to the child's needs, and provides treatment objectives that are reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time. § 19-1-103(12), C.R.S. 2024; *People in Interest of K.B.*, 2016 COA 21, ¶ 13.

¶ 7 We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, which we assess in

light of the facts existing at the time the juvenile court approved the plan. *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005). The court may modify a treatment plan when new information or changed circumstances render a previously approved treatment plan no longer appropriate. *Z.P.S.*, ¶¶ 26-27. The fact that a treatment plan isn't ultimately successful doesn't mean that it was inappropriate when the court approved it. *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

¶ 8    A juvenile court has discretion to formulate a treatment plan that relates to the child's needs and is reasonably calculated to render the parent fit within a reasonable period of time. *People in Interest of M.W.*, 2022 COA 72, ¶ 32. A juvenile court abuses its discretion when its actions are manifestly arbitrary, unreasonable, or unfair or based on an erroneous understanding or application of the law. *Id.* at ¶ 12.

### B.    Analysis

¶ 9    After a contested hearing, the juvenile court adopted a treatment plan for father that included an objective that the child "experience a home environment free from physical violence and coercive control." The objective included action steps requiring

father to "demonstrate non-abusive, non-violent behavior," acknowledge past abuse and violent behavior, attend a domestic violence treatment program, encourage mother's connection with the child and her support system, and refrain from physically violent and coercive behaviors in the future.

¶ 10 As part of the termination judgment, the juvenile court found that the domestic violence objective in the treatment plan was both appropriate and necessary. The court also found "by clear and convincing evidence, that [father] emotionally, psychologically, and physically abuses [mother]."

¶ 11 During the hearing to amend the treatment plan and the termination hearing, father maintained that he wasn't a perpetrator of domestic violence because he hadn't been criminally charged or convicted of domestic violence. The juvenile court specifically considered and rejected this argument, finding that (1) "domestic violence can, and in this case does, exist outside a formal criminal system;" (2) father wasn't credible in his denial given "his own behavior and demeanor during trial, the testimony and evidence presented regarding domestic violence, past law enforcement involvement, and [mother]'s interactions with [father] during trial;"

and (3) the results of the parent-child interactional assessment, which revealed father's "hyperfocus on [mother], to the exclusion of being fully engaged with the child." Accordingly, the court found that "the provisions of the treatment plan which addressed the emotional and physical safety of the child in the home, with no elements of domestic violence, [were] appropriate."

¶ 12 The record supports these findings, made at both the dispositional and termination hearings. The caseworker testified that domestic violence "is not just a criminal act, it is a pattern of coercive and controlling behavior that is often unreported to law enforcement." The guardian ad litem's expert on victim/offender dynamics testified that physical violence or injury "does not have to be a part of it and is oftentimes used as coercive control . . . there may not be any violence involved at all." The caseworker testified that the original referral included information about two incidents — one the day of the child's birth and one a few days later — where the parents were fighting and law enforcement became involved. The caseworker testified that she and other Department employees observed father's coercive control of mother "on multiple occasions." Mother and father failed to appear for meetings with the

Department when they were fighting. Department staff observed bruising on mother, which she would try to explain away without prompting. Mother told her family and the Department that she wanted to leave father but was "extremely fearful of retaliation." Father himself testified that when mother attempted to leave the relationship he called the Department and told them that mother was using illegal substances. The caseworker testified that father frequently spoke on behalf of mother and, in at least one text conversation with the caseworker, responded impersonating mother.

¶ 13    Importantly, the caseworker testified that the domestic violence in mother and father's relationship needed to be addressed before reunification could safely occur. The caseworker testified that "the level of fighting and tension in their relationship continues to prevent [mother and father] from being able to be fully present for [the child]." Both mother and the caseworker testified that mother declined to attend family time without father, even though the Department offered to transport her. The caseworker also testified that domestic violence, including patterns of coercive and controlling behavior, impact children "significantly." The

caseworker opined that "the impact of domestic violence on really small children, especially, is pretty profound." The caseworker expressed concern about reunification because if the child "were to be full time in their home, she would absolutely be exposed to violence and chaos" based on the caseworker's observations of the power and control dynamic between father and mother.

¶ 14     The record also supports the juvenile court's detailed findings regarding its observations of the dynamic between mother and father during the termination hearing. The court noted that "when questioned on domestic violence . . . [mother] looked to [father] at every question and her eyes flicked to him during her answers, her body language shifted dramatically, including a rounding of the shoulders, picking at her fingers, and her voice lowered to the point she was difficult to hear." The record reflects that mother looked to father during her testimony. Indeed, at one point, father audibly interrupted mother's testimony to tell her what to say. In his testimony, father denied that mother ever had injuries while the case was pending, despite testimony from the caseworker and the placement provider to the contrary.

¶ 15    The court found that mother "exhibits a level of anxiety, and fear, even in the presence of other people when she should otherwise feel safe.  [Father] is not even able to manage his own anger in front of the judicial body."  It's within the juvenile court's purview to determine witness credibility.  *See In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence . . . ."); *see also Carrillo v. People*, 974 P.2d 478, 486 (Colo. 1999) (recognizing "the trial court's unique role and perspective in evaluating the demeanor and body language of live witnesses" and "discourag[ing] an appellate court from second-guessing those judgments based on a cold record").

¶ 16    Father claims that the addition of the domestic violence objective in his treatment plan "was not in response to safety concerns identified during an assessment of the family."  But the record belies this assertion.  The petition filed in Archuleta County identified domestic violence as a concern in the initial assessment. At the hearing to amend father's treatment plan, the caseworker testified that the Department also conducted a safety assessment

that identified domestic violence as a "specific and observable threat to the child," which was a barrier to returning the child home.

¶ 17    Likewise, the record doesn't support father's assertion that he "could not participate in domestic violence treatment" because "he had never been charged with a criminal offense and he was not willing to admit that he had committed such a criminal offense." Because father made a similar argument at the termination hearing, the juvenile court addressed it in the termination judgment, as follows:

> [Father] would have the court find that [the domestic violence provider] said he did not have to engage in domestic violence treatment because he's never been charged and convicted of domestic violence and therefore, cannot be made to attend treatment . . . . The court strenuously disagrees with [father']s interpretation . . . . What [the domestic violence provider] concluded is that [father] denies he has ever perpetrated domestic violence. If a perpetrator will not admit or acknowledge they have engaged in domestically violent behavior, treatment will, in essence, have no effect. If a perpetrator has a conviction or pending criminal charges, this can be used to challenge the denial and become a starting place for treatment. [Father] has no criminal charges nor convictions. Therefore, in the face of this outright denial, [the domestic violence treatment provider] concluded that "since he was unable to

acknowledge violence by him, it was determined that having him do individual domestic violence counseling was wasteful of time."

¶ 18    Based on this observation, the court found that father's "denial [was], in effect, a refusal to engage in domestic violence treatment" or address the "violent and coercive and controlling behavior" which was a barrier to reunification with the child. The record supports these findings.

¶ 19    The domestic violence provider testified that she was a licensed therapist approved by the Domestic Violence Offender Management Board to provide treatment "for clients who are mandated to do domestic violence treatment." She further testified that father "can't be in the treatment program because there's no domestic violence charge, but [she] could do individual domestic violence focused treatment with him." The domestic violence provider testified that domestic violence treatment would include things like taking accountability and victim empathy, but father's focus "was more in that they had psychological stressors and they had lost custody . . . so [she couldn't] do domestic violence treatment with somebody who says there's not domestic violence."

Although the domestic violence provider offered, and father agreed to, individual counseling, father didn't come to their scheduled appointment and declined the Department's further efforts to provide individual counseling.

¶ 20    Finally, father contends that the juvenile court erred in referencing a criminal matter in its findings regarding the appropriateness of the treatment plan.  At the treatment plan hearing, the court disclosed that it presided over a criminal matter involving mother and therefore had background information that it considered, in addition to the caseworker's testimony, "with regard to certain behaviors that have occurred."  At the termination hearing, the court disclosed that other cases were "set in [its] division and therefore the court does have knowledge" and, later in the proceedings, that it received information "not just through this particular case but through related correlated criminal cases." However, despite the court's clear and repeated disclosure of its knowledge and consideration of the criminal matter involving mother, father didn't raise any objection.  We therefore decline to address this contention now.  *See People in Interest of T.E.R.*, 2013 COA 73, ¶ 30 (generally, issues not raised in the trial court will not

be considered on appeal); *see also People v. Rediger*, 2018 CO 32, ¶¶ 39-40 (when a party waives an issue below, we do not review it on appeal).

III.   Reasonable Efforts

¶ 21     Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to provide her with substance abuse and domestic violence treatment.  We aren't persuaded.

A.   Applicable Law and Standard of Review

¶ 22     A department must make reasonable efforts to rehabilitate parents and reunite families following the out-of-home placement of an abused or neglected child.  §§ 19-1-103(114), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2024.  "Reasonable efforts" means "the exercise of diligence and care" to reunify parents with their child. § 19-1-103(114).

¶ 23     To that end, services that are provided in accordance with section 19-3-208, C.R.S. 2024, are consistent with reasonable efforts.  § 19-1-103(114).  The services that "must be available and provided" as determined by individual case planning include, among others, screening, assessments, home-based family and

12

crisis counseling, information and referral services to assistance resources, family time, and placement services. § 19-3-208(2)(b). Additional services may be required if funding is available, including transportation, childcare, diagnostic and mental health services, drug and alcohol treatment services, and family support services. § 19-3-208(2)(d).

¶ 24 To evaluate whether a department made reasonable efforts, a juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). But a department has "discretion to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33. So, whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.

¶ 25 The parent is ultimately responsible for using the provided services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285

(Colo. App. 2011). The court may therefore consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 26 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts. *See id.* In particular, the ultimate determination of whether the Department provided reasonable efforts is a legal conclusion we review de novo. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

### B. Substance Abuse Treatment

¶ 27 Mother's treatment plan included an objective that she "will be physically available to meet all of [the child]'s needs and will ensure all of [the child's] basic needs are met." As relevant here, the

objective included action steps requiring that mother complete a substance use evaluation and follow any treatment recommendations. Mother completed the evaluation, which recommended that she attend treatment two to four times a month for at least six months, "with a combination of group and individual sessions to address anxiety, depression, and gain relapse prevention skills." Mother attended a follow-up appointment with the clinician three months later. The clinician testified that she called mother several times after the appointment to engage mother in the recommended treatment, but she wasn't able to reach her.

¶ 28    Ten months after the evaluation, mother told the caseworker that she didn't have a good connection with the clinician and wanted a different provider. The caseworker attempted to connect with mother's preferred provider, but could only find information indicating that the provider wasn't in private practice. Mother didn't respond to the caseworker's request for more information.

¶ 29    The juvenile court found that the Department provided mother with reasonable — and at times, active — efforts towards reunification. These efforts included case management services, placement services, gas voucher assistance, family time services,

transportation, telephones, information about domestic violence survivor organizations, shelters, and Medicaid, and referrals for a parent-child interactional assessment and a substance abuse evaluation.

¶ 30    Mother now contends that the Department didn't make reasonable efforts because it failed to address her request for a different therapeutic provider.  Mother doesn't provide — and we aren't aware of — any authority that indicates that a department must provide a referral to a provider of a parent's choice.

¶ 31    In any event, the juvenile court considered mother's argument and found that mother "did not pursue finding another treatment provider as was her responsibility . . . .  [W]hen advised on ways she could obtain a different provider, [mother] never followed through." The court found that mother "took only minimal steps to complete the evaluation but did nothing further to comply with this requirement of the treatment plan . . . .  [Mother] cannot admit, let alone address, her addiction issues, despite more than ample efforts by [the Department] to engage her in treatment."

¶ 32    The record supports these findings regarding the Department's efforts to provide mother with substance abuse treatment.  The

Department made a timely referral for a substance abuse evaluation. Ten months later, mother told the Department she wanted a different provider. The caseworker testified that she obtained a release of information from mother and attempted to locate the provider that mother had requested. When the caseworker was unable to reach mother's preferred provider, the caseworker asked mother for more information. Both the caseworker and the original clinician testified that they could have helped mother get connected with a different therapeutic provider, but mother didn't ask them to do so. The record therefore supports the juvenile court's finding that it was mother's failure to follow through with treatment, and not a lack of reasonable efforts, that prevented her from successfully completing this objective. *See A.V.*, ¶ 12.

### C. Domestic Violence Treatment

¶ 33 Mother's amended treatment plan included an objective that she "will use her knowledge of domestic violence victimization and safety strategies to enhance her and [the child]'s safety and well-being." The treatment plan originally included an action step that mother meet with a specific provider, Alternative Horizons, but was

17

amended five months later to reflect mother's request to meet with a different provider, Rise Above Violence.

¶ 34    The juvenile court found that the Department made multiple referrals for mother to comply with this treatment plan objective. The court also found that the Department made reasonable efforts by providing mother with information about the domestic violence survivor resources, including local agencies, shelters that could house her if she decided to leave father, and other safety planning attempts. The court found that, "despite these efforts, [mother] did not engage in any aspects of her treatment plan."

¶ 35    Mother contends that the juvenile court erred in making these findings because the Department "never attempted to engage in safety planning with mother" despite a requirement in the treatment plan that mother "meet with the caseworker, learn what services were available and create a safety plan."

¶ 36    But this contention misstates the record made by the Department when the domestic violence objective was adopted. At the contested disposition hearing, the caseworker testified that mother needed to meet with the caseworker to obtain a referral to the domestic violence provider. But the caseworker made clear that

the treatment plan required mother to "work with the local domestic violence shelter to identify a safety plan for herself."

¶ 37 The record made at the termination hearing further supports the juvenile court's findings. The caseworker testified that she made mother aware of the scope of services available through both domestic violence survivor organizations. The expectation and hope was for mother to "meet with a domestic violence advocate because the safety planning process is very intensive." The caseworker made clear that a safety plan should be made with a domestic violence advocate and not a caseworker because the advocates are specially trained and have a specific safety planning tool that is "far more detailed and comprehensive" than what was available through the Department. In any event, the caseworker testified that the Department followed up with mother often, gave her information about the resources that were available, and offered to take mother to an appointment with the domestic violence survivor organization where she could make the required safety plan. Despite these efforts, the caseworker testified that mother didn't follow through with scheduling an appointment, attending an appointment, or creating a safety plan during that appointment.

¶ 38     The juvenile court's factual findings are supported by the record.  And considering those findings, we agree with the court's conclusions that the Department made reasonable efforts to rehabilitate mother and reunify the family.  Thus, we discern no error.

## IV.   Disposition

¶ 39     The judgment is affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.